JOSÉ RAMÓN and SEGISMUNDO QUIÑONES QUIÑONES, Plaintiffs and Appellees, v. ROSENDO QUIÑONES IRIZARRY, Defendant and Appellant.

No. 54.      Decided November 9, 1964.

*Luis A. Negrón López* and *José Martín Betancourt* for appellant. *Mariano Acosta Velarde* and *Daniel Pellón Lafuente* for appellees.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

This is a review of a favorable judgment rendered in an action of redemption of co-owners. Main points in this appeal: the extinguishment of plaintiffs' right and the status of stranger of the defendant purchaser.

On June 15, 1954, the brothers José Ramón and Segismundo Quiñones Quiñones filed in the Superior Court, San Juan Part, an action of legal redemption against their cousin, Rosendo Quiñones Irizarry. They alleged in the complaint, briefly:

That together with their sisters, Sara and Antonia Quiñones, they were joint and undivided owners of three rural properties situated in the ward of Sabana Grande Abajo, of San Germán, the first of which has an area of 66.50

cuerdas—its correct area at that time was 49.75 cuerdas—the second 8.46 cuerdas, and the third one cuerda; that by public deed executed on May 25 their sisters Sara and Antonia "sold and transferred to defendant Rosendo Quiñones Irizarry, who is a stranger to the community, for the price of $2,000 for each one of them, the interest (equal to one sixteenth) corresponding to each one of them in the three properties"; that they deposited the selling price of $4,000 and were willing to pay the expenses of the deed of resale and to subrogate themselves in the place of the purchaser under the same terms of the contract, promising not to sell, during four years, the interests object of the action, and that "they had knowledge of the sale of the interests . . . on the 11th day of June."

The action was transferred to the Mayagüez Part of the Superior Court. There defendant answered and counterclaimed. In his answer he denied that at the time of executing the sale which gave rise to the action of redemption the two brothers José Ramón and Segismundo, and the two sisters Sara and Antonia, were the sole joint and undivided owners of the three properties described in the complaint, alleging on the contrary that on the filing date of the complaint the joint and undivided owners of those three properties "and of all the others which will be described later" were and continued to be the following persons: the two plaintiff brothers and their two vendor sisters, Sara and Antonia, jointly with the defendant and all the other "voluntary heirs" of their paternal uncle Mariano and aunt María de los Dolores Quiñones Guzmán; he admitted the execution of the sale; he denied that he was a stranger to the community, alleging that he "is one of the members of the community," for which reason "the interests object of this action of redemption were sold to a co-owner, wherefore neither the action of redemption nor the subrogation sought by plaintiffs lies against the latter." Regarding the date on which

plaintiffs allegedly had knowledge of the sale, he alleged: ". . . plaintiffs had knowledge of the sale . . . before the same was executed, during the negotiations of said sale, from the very date of the execution of deed No. 7 of May 25, 1954 . . . and prior to that date, and that they refused to acquire, obtain or purchase the interests . . . and they waived their right to purchase those interests . . . and, hence, to the action of redemption which they seek to exercise."

As defenses, he alleged: (1) the prescription of the action of legal redemption pursuant to § 1414 of the Civil Code; (2) the express waiver of the exercise thereof by plaintiffs; and (3) and that the public deed on division of community executed on January 21, 1944—10 years ago—before Notary Oscar Souffront, whereby he withdrew from the community of property then existing on those three properties between him and his four cousins, the Quiñones brothers and sisters, having received a parcel of 16.75 cuerdas, segregated from the property of 66.50 cuerdas, in final and full settlement of his share or interest in all the properties of the community, was void, ineffective, and without legal value because: (a) José Ramón Quiñones appeared in that deed as attorney in fact for his aforesaid aunt, María de los Dolores Quiñones Guzmán, and for the members of the succession of his father, Tomás Quiñones Guzmán, composed of his widow, Antonia Quiñones, and of her four children, José Ramón, Segismundo, Sara and Antonia Quiñones Quiñones, without legal authorization therefor, wherefore he was not given a valid title to the said parcel of 16.75 cuerdas recordable in the Registry of Property; (b) 16.75 cuerdas had been "fictitiously and knowingly" adjudicated to him instead of 18.74 cuerdas to which he was entitled, thereby concealing the correct area of the properties; (c) the title under which José Ramón Quiñones claimed to be the owner of the interests in those properties which had belonged to his aunt, María de los Dolores Quiñones Guzmán,

was null and void, and without legal value; (d) assuming the validity of that title, his said aunt could not have transmitted to him one-half of those properties in which she actually owned one-fourth, since she never inherited the other fourth which she allegedly owned as sole heir of her brother Mariano because the latter's will was null and void; and (e) assuming that she validly acquired the same by inheritance, María de los Dolores Quiñones Guzmán had not paid the corresponding inheritance tax thereon, wherefore the division of community made in 1944 was in violation of the provisions of the Inheritance Tax Act.

The counterclaim alleges two causes of action. By the first it seeks the declaration of nullity (1) of the open will executed on February 21, 1919, by the uncle Mariano Quiñones Guzmán, who died on May 31, 1922—that is, 33 years previously, since the counterclaim was filed on March 23, 1955—instituting his sister, María de los Dolores Quiñones Guzmán, his sole and universal heir; and (2) the nullity of the deeds of sale and of acceptance of sale executed, respectively, by the said aunt before a consular official in Barcelona, Spain, on September 3, 1941, and by José Ramón Quiñones in Mayagüez on the following October 20 before Notary Oscar Souffront—both executed more than 13 years ago—whereby she sold and the latter purchased the totality of the other 11 rural properties and the undivided interest and the usufruct of the other half which she owned in the three properties object of redemption, the transferor having acquired 50 per cent of those properties by virtue of the said open will of her brother, Mariano Quiñones Guzmán. It was prayed, in the event such nullities should prosper, for an order to distribute the properties, including the fruits, of both predecessors, uncle and aunt, among the eight nephews and nieces named in the counterclaim.

In the second cause of action the counterclaimant alleged that the said co-redemptioner, José Ramón Quiñones Qui-

ñones, deprived him in 1944 "of a share in agricultural farms" consisting "in a piece of land of not less than two (2) cuerdas," wherefore he prayed for an order to pay him the fruits which such interest should have produced valued at $4,000.

Plaintiffs replied to the affirmative defenses of the answer and of the counterclaim, and alleged "new matter of special defense to the defenses of fact and of law alleged in the answer." In opposition to the claims of defendant-counterclaimant, they alleged the defenses of estoppel, extinctive prescription of actions, and acquisitive prescription of ownership. They denied the material facts set forth in the counterclaim, alleging that all transactions, acts, and contracts challenged therein were valid and effective at law.

The trial was held between March 5, 1958 and the following May 9, the hearing having lasted six days. The documentary and oral evidence is abundant. The stenographic record consists of three voluminous pieces. Some 60 documents admitted and a few others unadmitted were sent up.

Final judgment was rendered on September 25, 1958, sustaining the action of redemption and dismissing the counterclaim, with costs, without imposition of attorney's fees. Defendant did not move for reconsideration nor made any motion under Rule 43.2 requesting amendments to the findings of the court, or to make additional findings. In view of their importance in this appeal, we copy below the findings of fact made by the trial court:

"1. On May 25, 1954, by deed No. 7 executed before Notary Salvador Suau Carbonell, Sara Quiñones widow of Domínguez and Antonia widow of Sotográs, plaintiffs' sisters, sold to defendant Rosendo Quiñones Irizarry the undivided share of one-fourth part of one fourth part owned by each one of these vendors in the properties of 66.50 cuerdas, of 8.46 cuerdas, and of one cuerda situated in the ward of Sabana Grande Abajo, of San Germán, which are described in paragraph one of the

complaint, the selling price being $2,000 for each interest. The sale was not recorded in the Registry of Property.

"2. Although plaintiffs had knowledge, a few days prior to the execution of this deed, that their two sisters wished to sell their share in these properties and that defendant Rosendo Quiñones wished to buy, since their sisters had signified their intention to sell and urged them to inform them whether they wished to buy, at the time the sale was executed plaintiffs had not told their sisters clearly and definitively that they did not wish to acquire their interests and that they were agreeable to their selling to defendant. While plaintiffs were considering whether or not they wished to buy their sisters' interests, plaintiff José Ramón Quiñones left for the United States, and upon his return the sale in favor of defendant had already been executed. José Ramón Quiñones left Puerto Rico on May 23, 1954, or two days before the execution of the sale, and returned on June 2, 1954.

"3. Seven days after returning to Puerto Rico, namely, June 10, 1954, plaintiffs learned for the first time, through a telephone call received by plaintiff José Ramón Quiñones from Mr. Oscar Souffront, that the sale of their sisters' interests to defendant had been executed on May 25, 1954. The following day plaintiff José Ramón Quiñones called at the office of Mr. Salvador Suau Carbonell, the notary who had authorized the sale of the interests of his sisters, where he learned the details of the transaction.

"4. Upon learning that the interests of their sisters had been sold to defendant for the price of $2,000 each, plaintiffs considered that the price was low and that it was convenient for them to reacquire under those terms the undivided interests of their sisters, and thereupon they took the necessary steps with their attorneys to bring the corresponding action of redemption, which was filed in the Superior Court of San Juan on June 15, 1954.

"5. Adjacent to these three properties were several properties with a total area of some 200 cuerdas of land which plaintiff José Ramón Quiñones operated as owner since 1941. The said properties, which are those described at pp. 12, 13, and 14 of the counterclaim, were acquired by plaintiff in 1941 by purchase from his aunt, Francisca Quiñones Guzmán. The sale transaction was carried out by means of an instrument

executed by Francisca Quiñones Guzmán on September 3, 1941, in the city of Barcelona before the Vice Consul of the United States in that city, which was afterwards ratified and accepted by plaintiff José Ramón Quiñones by deed No. 145 executed in Puerto Rico on October 20, 1941 before Mr. Oscar Souffront.

"6. In the document executed in 1941 by Francisca Quiñones Guzmán in the city of Barcelona, the executing party herself appraised at $56,200 the properties which she was selling to plaintiff José Ramón Quiñones, also setting forth therein as to the selling price the following:

" 'THIRD. That she has agreed to sell, and does hereby sell, to her nephew, José Ramón Quiñones Quiñones, of full age, a bachelor, Chairman of the Public Service Commission of Puerto Rico, and resident of San Juan, Island of Puerto Rico, United States of America, all rights and actions which may correspond to her in the properties described hereinabove, conveying to him as of the day hereof any title or interest thereto which the vendor may have, in consideration of a monthly pension of four hundred dollars (legal tender of the United States) which Mr. Quiñones binds himself to pay to the executing party for life.'

" 'FOURTH. Mr. Quiñones binds himself to accept this contract within a period of six months counted as of the day hereof, the effects of which acceptance shall be retroactive to those of this execution. It is a condition of this contract that each and everyone of the properties described are subject to the life annuity obligation during the life of Miss Quiñones.'

"7. The document was duly signed by Francisca Quiñones Guzmán and subsequently authenticated by the Vice Consul of the United States of America in Barcelona attesting to his personal knowledge of the executing party. And in compliance with the statements set forth in that document by Francisca Quiñones Guzmán and the six months' period stipulated for acceptance thereof, plaintiff José Ramón Quiñones appeared on October 20, 1941 before Mr. Oscar Souffront, here in Puerto Rico, and executed deed No. 145 in which the aforementioned document was copied, setting forth immediately following that plaintiff José Ramón Quiñones accepted the aforesaid document in its entirety, binding himself to pay to the vendor a pension of $400 for life, counted as of the day the deed was executed

by Francisca Quiñones Guzmán before the Vice Consul in Barcelona.

"8. Among the properties which were sold by this transaction by Francisca Quiñones Guzmán to plaintiff José Ramón Quiñones was her share in the three properties object of the action of redemption by plaintiffs, which share was equal to one-half in fee simple and the usufruct of the other two-fourths, one of which belonged in naked ownership to plaintiffs and their two sisters, and the other fourth to defendant Rosendo Quiñones Irizarry (see exhibit C of defendant).

"9. From 1919 to 1936 all of these properties were leased to Central Guánica, and from that year and until 1941 to Alfredo Ramírez de Arellano for an annual rental of $30 per cuerda, the taxes on which were paid by the lessee. During all these years in which these properties were leased, defendant Rosendo Quiñones Irizarry, who only owned the naked ownership of one-fourth of the three properties object of the action of redemption, always received his proportional part of the rental and never claimed a greater participation in the income from the lease, the balance of the rental being received by plaintiffs' aunt, Francisca Quiñones de Guzmán, defendant having always recognized the ownership right and the usufruct belonging to her in these properties. (See exhibit C.) During the time the properties were leased to Central Guánica defendant received $303 annually from the lease rental, and during the time they were leased to Ramírez de Arellano he received $487 annually, notwithstanding he only owned the naked ownership of one-fourth of the three properties object of the action of redemption. (See exhibit C.)

"10. After plaintiff José Ramón Quiñones acquired in 1941 by purchase the properties and the shares of his aunt, Francisca Quiñones de Guzmán, defendant urged plaintiff to liquidate his share in these three properties in which plaintiff had acquired the full ownership of one-half, the usufruct of one-fourth belonging in naked ownership to him and to his brothers, and the usufruct from the interest of one-fourth belonging to defendant Rosendo Quiñones in naked ownership. (See exhibit GG.)[1] To that end, deed No. 6, on division of community (ex-

---

"[1] Notwithstanding this, plaintiff continued to recognize to defendant the right to share the income from these properties as if the latter had the full ownership of his one-fourth interest."

hibit 1), was executed on January 21, 1944 before Mr. Oscar Souffront, adjudicating to defendant, in payment of his undivided interest in these three properties, a portion of land of 16.75 cuerdas which was appraised by the executing parties at $3,350, or about $200 per cuerda, the interest of plaintiff and of his brother and sisters being reduced to an area of 59.31 cuerdas. Although up to that moment defendant Rosendo Quiñones had no title to the usufruct of his interest, the executing parties in that deed recognized that defendant was in full dominion of one-fourth of those properties.

"11. In the aforementioned deed of division of community the defendant appeared in his own right, and plaintiff José Ramón Quiñones as attorney-in-fact for the heirs of Tomás Quiñones Guzmán composed of his widow, Antonia Quiñones widow of Quiñones, and his children, Sara Quiñones widow of Domínguez, Antonia Quiñones widow of Sotográs, Segismundo Quiñones, and the appearing party, José Ramón Quiñones Quiñones, the appearing parties setting forth in the deed that José Ramón Quiñones was the owner of one-half of the three properties, which are the same three properties object of the action of redemption in this case, having acquired the same by deed executed by Francisca Quiñones Guzmán on September 3, 1941, before the Vice Consul of the United States in the city of Barcelona, which deed was duly ratified by deed No. 145 executed in Mayagüez on October 20 of that year.

"12. Plaintiff José Ramón Quiñones appeared in the deed as attorney-in-fact for his mother and his brother and sisters under the authority of a power of attorney from his mother, Antonia Quiñones widow of Quiñones (exhibits 18 and 4), of his sister, Antonia Quiñones widow of Sotográs (exhibit 21), and of his brother, Segismundo Quiñones (exhibit 3), for the purpose of selling or alienating their real property, and also a verbal power of attorney of his sister Sara to carry out the transaction. It was also set forth in the instrument that the undivided one-half which plaintiff José Ramón Quiñones had acquired in 1941 from his aunt, Francisca Quiñones Guzmán, was subject to the right of 'usufruct' constituted in favor of Francisca Quiñones Guzmán in the instruments of the transaction between said plaintiff and his aunt, setting forth further, after adjudicating to defendant the portion of 16.75 cuerdas

corresponding to him in payment of his share of one-fourth part in these properties, that the remainder of the properties having an area of 59.31 cuerdas belonged in full dominion, one-third to Antonia Quiñones widow of Quiñones and to her children Sara, Antonia, Segismundo and José Ramón, and two-thirds to plaintiff José Ramón Quiñones, which two-thirds were subject to the usufruct mentioned in the instrument in favor of Francisca Quiñones Guzmán.

"13. Francisca Quiñones Guzmán died on January 12, 1954, at the age of 93 years. Doña Paca lived in Europe most of her life on income, first from the income produced by the lease of her properties to Central Guánica and to Ramírez de Arellano, and then on the annuity of $400 a month for which she agreed to sell the properties object of the counterclaim to her nephew, José Ramón Quiñones, who was her favorite nephew and the person in charge of his aunt's affairs ever since she acquired these properties in 1922 by inheritance from her brother, Mariano Quiñones, the latter having executed a power of attorney in favor of her nephew to administer those properties (see exhibit 2). When Doña Paca sold these properties in 1941 to plaintiff José Ramón Quiñones, she set forth in the instrument executed in Barcelona before the Vice Consul of the United States that she appraised each of the properties at a total value of $56,200. After selling her properties to plaintiff, Doña Paca lived until January 1954, having received from him a total sum of some $60,000 as the annuity agreed upon as selling price of these properties.

"14. The properties sold by Francisca Quiñones widow of Guzmán to her nephew, José Ramón Quiñones, appeared in the deed with a total area of 219.50 cuerdas. Seventeen of those cuerdas consisted of underbrush having no agricultural value, and a portion of about 18 cuerdas was enjoyed by defendant as his own, plaintiff José Ramón Quiñones having the full ownership and usufruct of the remaining arable 184.50 cuerdas which, on the basis of the price fixed by the vendor, were worth a little over $300 per cuerda, which price was not exiguous or unreasonable, since in 1944 and 1945 the Government of Puerto Rico assessed sugarcane lands adjoining these properties, belonging to Central Guánica and which had been

condemned in 1943, at the rate of $326 per cuerda. It should be borne in mind that already in 1943 the Second World War was in full swing, and that the value of the sugarcane farms which in the first years of the war had suffered the inconvenience of shortage of fertilizer and quota restrictions had begun to soar when the sugar restrictions were lifted and the price of sugar went up. Furthermore, defendant himself had appraised the portion of 16.75 cuerdas, adjudicated to him in 1944 by deed of division of community, at $3,350, which was the price per unit of about $200 per cuerda, and the parcel adjudicated to defendant did not include the hilly part of the properties having practically no agricultural value, which corresponded to plaintiff and his brother and sisters.

"15. It is true that until shortly before Doña Francisca sold those properties to plaintiff, they had been leased to Alfredo Ramírez de Arellano at the rate of $30 per arable cuerda of sugarcane, and that Doña Francisca received annually about $1,000 more for the lease than the $4,800 which she would receive from her nephew José Ramón, as life pension, for her share of about 184.50 cuerdas. However, it should be borne in mind that the term of that lease had already expired, and there was no certainty that another lease as advantageous as this could be obtained,[2] it being the opinion of defendant himself that it was not advisable to lease the properties again since they would run the risk of forfeiting part of the quota (see exhibit 24), in which case Doña Francisca would have to confront the alternative of operating her properties with the uncertainty of an unstable market and serious restrictions in the fertilizer quotas (see defendant's letter of May 31, 1942, exhibit 25).

"16. From the time the parcel of 16.75 cuerdas was adjudicated to defendant in 1944 by the aforementioned deed of division of community, defendant has been operating that property for his sole benefit, relying on the deed of division of community to assert his ownership rights to that parcel, without chal-

---

"[2] After the property was leased to Ramírez de Arellano a majority of those interested in taking a lease only offered $25 per cuerda (see exhibit 37), which would only have produced to Doña Paca about $4,000 for her 184.50 cuerdas."

lenging or questioning at any time the capacity of plaintiff José Ramón Quiñones for appearing in that deed in his own name and that of his brother and sisters for the purpose of adjudicating those lands to defendant, defendant having considered himself during all these years as a stranger to the community in which there remained plaintiffs and their sisters as respects the remaining 59.31 cuerdas of those properties, such being also the reality established by the evidence. Before adjudicating that parcel of 16.75 cuerdas to defendant the properties object of the action of redemption had been surveyed, their area being 74.93 cuerdas, including several cuerdas of underbrush, defendant having been agreeable to the adjudication to him, in payment of his interest of one-fourth of those 16.75 cuerdas of wholly flat land, which had in proportion more frontage on the road than the remainder of the properties."

At defendant's request, we decided to review the judgment. He maintains before us that those 16 findings of fact "could not be warranted in any manner whatsoever in accordance with the evidence heard," and that gross errors were committed in the weighing of the evidence "the nature of which invalidates the application of legal provisions which are fundamental and definitive in the determination of appellant's rights." He proposes that in lieu thereof we adopt a series of 16 findings which he terms "Findings of Fact Omitted" which, in his opinion, are the ones which should have been made.

As to the conclusions of law, he alleges that those relating to the action of redemption as well as those relating to the two causes of action of the counterclaim constitute "errors in the application of the law to the facts of this case."

His brief, which is extensive and very ably prepared, does not follow the classical form of assignment of errors. Their order of exposition and argument is the following: First he sets forth the main fact determined in each finding, or its scope and significance. Next he argues or discusses

the reasons why in his opinion it is erroneous. Then he suggests the finding of fact which in his opinion the trial court should have made, stating the reasons in support thereof. As to the conclusions of law, he discusses their impropriety, but does not propose that we adopt others instead.

## I

Let us consider the challenges on the findings of fact and determine whether the same "could not be warranted in any manner whatsoever in accordance with the evidence heard." The following is appellant's fundamental theory.

Regarding findings of fact Nos. 1, 2 and 3, appellant challenges them as follows:

"Erroneous finding of fact No. 1.

"The trial court erroneously found as facts proved (findings of fact 1 and 2, p. 2 of the judgment) that at the time the sale of the interests object of redemption was executed the appellees had not clearly and definitively informed the vendors that they were not interested in acquiring such property and that they were agreeable that they should sell it to appellant, and that while the appellees were considering whether or not to buy, José Ramón Quiñones had to leave Puerto Rico, since the fact is, according to the evidence, that appellee Segismundo Quiñones personally, and appellee José Ramón Quiñones, through his attorney, Oscar Souffront, signified their decision not to buy the interests object of redemption and consented to the sale to appellant. These particulars were established by uncontroverted oral and documentary evidence.

"Erroneous finding of fact No. 2.

"The trial court erroneously found as proved facts (finding of fact 3, p. 3 of the judgment) that the appellees first learned of the sale of the interests on June 10, 1954, when the fact is that they knew about it before the deed of sale was executed, that they were served with notice of the execution of the deed on May 26, 1954, or more than nine days prior to the filing of the action of redemption."

The evidence, as summed up, on the facts found proved[1] by those first three findings is as follows:

*For plaintiffs:* Mr. Oscar Souffront, first witness for plaintiffs, testified on direct examination that he had known José Ramón and Segismundo Quiñones Quiñones and Rosendo Quiñones Irizarry for many years; that on the morning of June 10, 1954, on the porch or inside his office situated in Mayagüez appellant Rosendo had told him that he had

---

[1] It is well to point out at the start that the cause which gave rise in the middle of 1954 to the facts which culminated in the execution of the deed of sale of the interests consists of two letters from Rosendo Quiñones Irizarry to Antonia and Sara Quiñones, dated April 13, 1954 (exhibit AA of defendant), offering in similar terms to buy their interests. The text of one of them is the following:

"Box 321
Mayagüez, Puerto Rico
April 13, 1954

Dear Cousin Toñita:

I took the liberty of writing to Sara at your address because the purpose of the letter which I am writing to her is the same as that of the one which I am writing to you. I wish you would discuss the matter which I explained to her personally in detail. Sara will tell you about my need for purchasing your interests in the Coto lands of that property, the areas of which are 66.50 cuerdas, 8.46 cuerdas, and 1 cuerda, belonging to the heirs of Quiñones Guzmán.

Probably you don't know that you own these interests, but Sara will explain to you what I explained to her on the matter. My property is so small that your interests jointly with my lands would solve my problem. For this reason I make you the offer which you may consider proper, since surely you would never consider operating such a small portion of land.

Of these lands to which I refer above the heirs of Tomás Quiñones own an undivided one fourth, or 18.99 cuerdas according to the Registry of Property of San Germán. Of these 18.99 cuerdas you own an undivided one fourth, which would be about 4.75 cuerdas. Part of these 4.75 cuerdas is flat land and part high or hilly land. Wishing to own more lands to consolidate with my small property, I am willing to pay you $2,000 in cash for your interests and to pay for the deeds which may be executed, and also the expenses of setting up the landmarks, division of community, etc.

I trust you will consider and accept this offer. I would appreciate very much an answer on the matter as soon as possible.

With my best wishes for your welfare and health and regards from Angelita, I remain your loving cousin, (s) Rosendo."

acquired by purchase from Sara and Antonia Quiñones the interests object of redemption; that thereupon he called, by telephone, José Ramón Quiñones who was in San Juan to inform him of that conversation.

This witness identified a so-called statement of long-distance calls of the Puerto Rico Telephone Company (exhibit 6 of plaintiff) showing a call made by him to "J. Quiñones" of San Juan, on June 10, 1954.

On cross-examination Mr. Souffront said that he had had sporadic professional relations with José Ramón Quiñones because of an old and close relationship and because they were *compadres*, having always treated each other as brothers; that he had also had professional relations with Rosendo Quiñones Irizarry; on June 10 he called José Ramón Quiñones by telephone "to give him that information because he understood, from the way Rosendo explained to him, that he wanted him to inform Mon (familiar name for José Ramón Quiñones) that he had acquired those interests"; that at that time he and Mr. Ortiz Alibrán represented him in an income-tax matter and also he and Mr. Mariano Acosta Velarde in the matters of the inheritance of María de los Dolores Quiñones Guzmán, and had authorized as notary many deeds executed by him; that appellant Rosendo Quiñones Irizarry, prior to their conversation on the morning of June 10, told him that he was planning on buying the interests of sisters Sara and Antonia Quiñones; that Sara had also told him that she was planning on selling her interest because she needed money, without saying to whom she was going to sell; he said that he had not informed José Ramón Quiñones on these conversations, but later he said that he could not assert or deny that he had talked with him about those conversations. When appellant's attorney showed him a letter written by him on May 19, 1954 to Sara Qui-

ñones widow of Domínguez[2] (exhibit B of defendant), he said that prior to the date of that letter Sara had been to see him about several matters, possibly on the occasion of visiting the Presbyterian Hospital of San Juan where his wife was confined; that after this conference with Sara he got in touch with José Ramón Quiñones in connection with several propositions from his sister Sara, among them, that she wanted her mother to give her some money and that she wanted her brother José Ramón to intervene in the matter; that the latter had told him what he had told Sara Quiñones in his letter of May 19, 1954, the first paragraph of which is inserted in footnote 2; that José Ramón Quiñones did not tell him that neither he nor Segismundo was going to buy the interests; that such negative disposition did not appear from that letter; that the attitude of José Ramón Quiñones regarding the purchase of the interests of his two sisters was that if his brother Segismundo was not willing to assert his right of redemption if they were sold to Rosendo, he would not be willing either; that he had refreshed his memory by the telephone invoice, the information given him in the telephone company, and other data furnished by José Ramón Quiñones; that he could not recall whether Sara Quiñones spoke to him about the selling price offered by Rosendo for the interests, and that he had never spoken with Segismundo about those matters.

When he was asked whether he could "recall if prior to May 31 he had knowledge of the execution of the deed by Sara and Antonia in favor of Rosendo," he answered "I think not, that I had no knowledge," and that he could infer

---

[2] This letter, in its pertinent part, reads as follows:

"As soon as I came out from my interview with you, I got in touch with Mon who was in the best disposition to help you. To that effect, he told me that he had already spoken to Segismundo about his decision to exercise the right of redemption of co-owner and acquire the interests, and otherwise to let you know immediately giving his authorization and that of Mon to sell the interest to Rosendo."

that he had none from his telephone conversation with José Ramón Quiñones, testifying on this point what follows:

"With Mon, because otherwise I would have said to him, 'Listen, Rosendo was here some time ago and told me such and such a thing,' but my first impression was. . . . I did not know the disposition of the parties in the matter, nor could I prejudge that there was an action of redemption. If I had known which was the final attitude of Segismundo or of Mon as to whether they intended to redeem, I would have been on the lookout. Rosendo himself should know from his conversation with me and my impression whether I knew that a redemption would be filed. I had to know why Rosendo wanted Mon to know. Since they were relatives who were going to own jointly, it was natural that the other co-owner should know that."

The second witness to testify was Segismundo Quiñones. On examination by his attorney he stated, among other things, that in his own house, in the evening and in the middle of 1954, he spoke with his sister Antonia and she told him "that her cousin, Rosendo Quiñones, wished to buy the interests in that property belonging to her and to my sister Sara"; that he could not recall whether she had mentioned the price and terms of the purchase; that she had told him about Rosendo's wish to buy them; that on that occasion he informed his sister that "at that moment I was not interested in acquiring, in buying the shares, but that I would talk with my brother"; that because of the business of both, he and his brother José Ramón seldom saw each other, and yet, that "one day I came across him and said, 'Look, Mon, Antonia (my sister) has told me that Rosendo is interested in buying those interests.' He said to me, 'Yes, she told me about it. She wrote me a letter, but we have to talk that over. One of these days we are going to talk the matter over'; that afterwards his brother had to leave for the United States; after José Ramón returned, the latter went to see him and asked him: "Do you know that your sisters sold to Chendo?"—This is appellant's familiar name,

and "Segis" that of the witness—that to that question he answered: "I know nothing." His brother then said to him: "I just heard it because Souffront called me by telephone"; that then he asked his brother José Ramón, "What are we going to do?", and that the latter answered, "I believe that those lands should remain in our possession"; that later his brother said to him "that he was going to see Mr. Suau in order to get a deed"; that that was in June; that he told his brother that he thought "that those lands should come back to our hands . . . I suggested that the two of us should purchase those interests," and the complaint was made in order to reacquire those interests; that his sister Antonia, after his first conversation with her, asked him "what we had decided," to which he answered that "Mon was in the United States, that after he came back we could answer something definitely."

With slight variations, on examination by defendant's attorney, he gave identical answers, insisting that: "After my sister spoke to me, I spoke to him—to José Ramón—and then he said to me: 'We are going to consider this. Let's see if we can get together later and talk a little more about this.' I don't know why we did not continue the conversation at that moment. Then he left for the United States . . . and I did not have an opportunity to talk with him . . . The second time I spoke with him, he told me that Souffront had called him; that was when we talked about the matter. He said to me, 'I am going to file a legal redemption.' A complaint.' " On his conversations with his sister Antonia, he said that he had never told her that neither he nor his brother José Ramón wished to buy, nor that their decision was not to buy the interests, and again he said:

"The first time she spoke to me, I told her that I was not interested. Also, that since they were two cuerdas, that I did not wish to buy, but that I would talk to my brother. I did so. Since he is on the farm and operates it, and it is a matter of

agriculture, of which I know nothing; he does; I told her I was going to speak to my brother.

"THE COURT. Did she tell you that Rosendo was interested, whether you were interested?

"Yes. That I would speak to my brother. Since she does not see much of my brother, she said to me 'Speak to your brother and tell him.' I spoke to him one week or eight or ten days later."

The third witness to testify was José Ramón Quiñones. On direct examination he stated, insofar as pertinent to these findings of fact: That until May 23, 1954, he was in the city of San Juan; on that day he had to leave Puerto Rico for the United States where he visited the cities of New York and Washington on business of his office as President of the Farmers' Association, and Chicago where a radio and television convention was being held; he returned to Puerto Rico on the evening of June 3; on June 10 Mr. Oscar Souffront called him on the telephone from Mayagüez to inform him "that Rosendo Quiñones had called at his office and had told him that he had purchased the interests of my sister Sara and of my sister Antonia in our lands"; that Souffront "could not advise me of the price nor the terms, but he did tell me that Rosendo had told him that Mr. Suau, of San Juan, had authorized the deed"; that after the telephone conversation he called Mr. López Acosta, of San Germán,[3] whom he asked, after telling him about above conversation with Souffront, to go to the Registry of Property of San Germán and find out whether "that interest Rosendo said he had purchased from my sisters had been recorded there, and to inform me as soon as possible. I had just heard about it. Then he sent me a telegram";[4] the fol-

---

[3] Another account of long-distance calls of the Puerto Rico Telephone Company corresponding to the month of June 1954, showing a call made on the 10th of that month by "Quiñones" to "E. L. Acosta" which lasted eight minutes.

[4] The telegram reads: "32 J CJ 3:30 PM 11 PD. SAN GERMÁN. 10 JUNE 1954. MR. JOSÉ RAMÓN QUIÑONES, WAPA, PTA. DE

lowing day, June 11, he received a letter from Mr. López Acosta informing him that the sale of the interests to Rosendo had not been recorded;[5] that on June 11 he wrote a letter to Mr. Eusebio López Acosta, of San Germán, asking him to be on the lookout for the presentation of the deed of sale in the Registry;[6] that on the same day of June 11 he called in San Juan at the office of Notary Salvador Suau,

TIERRA. DOCUMENT INDICATED BY TELEPHONE DOES NOT APPEAR RECORDED NOR PRESENTED. WRITING. E. LÓPEZ ACOSTA. 5.01 P.M." (Exhibit 7 of plaintiffs.)

[5] Its text is as follows:

"June 10, 1954.—Mr. José Ramón Quiñones, WAPA, San Juan, Puerto Rico.—Dear Friend and Colleague:

Elaborating on my telegram, and according to the information which you gave me by telephone, I have searched in the Registry of Property of San Germán and have been unable to find any deed of sale of interests presented or recorded in Rosendo's name.

I also looked up the property under the name of Tomás Quiñones Guzmán and it is not recorded either in favor of Doña Sara, Doña Antonia, in your name, nor of any other person. The property of 15 cuerdas situated in the ward of Sabana Grande Abajo, Municipal District of San Germán, does not appear in the property index.

It would be convenient if you would furnish me with further information, and if there is anything in which I may co-operate with you, I am unconditionally at your service. Your friend and colleague, (s) E. López Acosta." (Exhibit 8 of plaintiffs.)

The post mark on the envelope of that latter bears the date of June 10 and the time of 7 p.m.

[6] This letter reads as follows:

"June 11, 1954—Mr. Eusebio López Acosta, San Germán.—Dear Friend and Colleague: I just received your telegram dated yesterday which reads as follows:

'DOCUMENT INDICATED BY TELEPHONE DOES NOT APPEAR RECORDED NOR PRESENTED. WRITING.'

Please be on the lookout for the filing of the deed involving the land which we talked about by telephone and to which your telegram refers. If necessary, you may pay any person to be on the lookout for this. Very truly yours, (s) José Ramón Quiñones."

Mr. López Acosta answered this letter by another of June 23, 1954, informing José Ramón Quiñones, in part, the following:

"I received your letter of June 11 of the present year, and I am pleased to advise you that the deed of sale in which you are interested has not as yet been presented in the Registry of Property." (Exhibit 17 of plaintiffs.)

who had authorized the deed of sale of the interests executed on the 24th of last May; that it was then that he showed him the deed, and "I learned that my two sisters actually sold on May 25 their shares in the interests to Rosendo Quiñones"; that prior to that date he knew absolutely nothing or had learned nothing, "nor under what conditions Rosendo sought to buy from my sisters, nor the price he was paying them, nor anything at all"; he asked the notary to give him a copy of that deed in order to show it to his brother Segismundo, which the notary did and delivered it to him on June 12, 1954;[7] that afterwards he showed the deed to his brother and explained its content; that "then we decided to bring action in the belief that we had the right to a redemption because that property belonged to my grandfather, José Ramón Quiñones Quiñones, which is my name, and to Francisca Quiñones, my aunt's name, and we wanted those lands to remain in the family because it has been my experience that if you sell your lands, sooner or later you will have nothing"; that they entrusted the handling of the action of redemption to Mr. Acosta Velarde on June the "13th or 14th," 1954.[8]

On cross-examination, he testified, in connection with the questions determined in the first two findings, that prior to June 10, 1954 Mr. Souffront had told him that his sister Sara wanted her mother to lend her $2,000, and that Sara

---

[7] This copy was offered and admitted in evidence as plaintiffs' exhibit 2 and was actually issued on June 12, 1954, "at the request of José Ramón Quiñones, brother of the executing parties."

[8] At that point of the testimony of José Ramón Quiñones, his attorney, Mr. Acosta Velarde, invited the court's attention to the fact that the complaint had been drawn up with some haste, and that he had to admit "the error committed in the deed" to the effect that it appeared from the certified copy of the deed of sale of interests which was delivered to him for the purpose of drawing up the complaint of redemption that the main property had an area of 66.50 cuerdas, when actually its correct area since January 21, 1944, was 49.75 cuerdas, as a result of the segregation of a parcel of 16.75 cuerdas made on that date. The complaint is dated June 14, but it was filed the following day.

wanted to terminate the declaration of heirship of aunt Paca Quiñones, and that on that occasion Souffront "told me that Rosendo was after her so that she would sell him the interest, and I told Oscar (Souffront) that I had to think it over seriously"; that he had told his sister Sara that "I would be absent because the sugar situation had become worse in Washington," and for that reason "I had to leave for the United States on May 23"; that when Souffront spoke to him about the sale of the interests, he had answered "I'll think it over." He insisted several times that he had not authorized Souffront to inform his sister Sara that she could sell her interest to Rosendo if Segismundo was not interested in buying it; that in his opinion what the first paragraph of the letter of May 19, 1954, which Souffront wrote to Sara—see footnote 2, p. 23—meant was "whether Segis was willing to buy, in that case I would have no objection because it was going to stay in the family.[9] He further testified that he had not contacted Souffront at all during the period elapsed since he returned to Puerto Rico in the evening of June 3 until the following June 10 when Souffront called him by telephone from Mayagüez; that although he knew Sara's intentions to sell her interest to Rosendo, "it did not occur to me that they would carry out the transaction without consulting me, or at least say 'Look, Mon,

---

[9] From pp. 375 and 385 of the first piece of the transcript we take the following:

"THE COURT: Did you on any occasion authorize Mr. Souffront to communicate to you sister Sara that you were agreeable to her selling her interest to defendant Rosendo Quiñones if Segismundo was not interested in buying?

"WITNESS: I never did. I never authorized either Souffront or anyone, nor consented to the sale of those interests.

.    .    .    .    .    .    .    .

"THE COURT: Did you at any time tell Souffront that you were not interested in purchasing that interest of your sisters?

"Oh no! Neither to him nor to anyone. Neither to Souffront nor to anyone. The deed . . . I left Puerto Rico on May 23, the deed was signed while I was in Washington staying at the Mayflower."

we are going to do this. Are you interested?'"; that Souf-front had not told him that either, that "One thing is to say that so and so has spoken to me about purchasing such a thing and another thing is to tell me 'Let us close the deal. Do you want to or not?'"; that the selling price offered to Rosendo was low.

From his cross-examination we copy what follows:

"Did you receive the deed from the hands of Mr. Suau the same day you asked him for it?

"No, sir. I went on the 11th to see Suau in his office, he showed me the deed, I asked him for a copy, he said: 'I'll send it to you tomorrow.' Hé sent it to me the next day. The deed after that letter was written.

"Mr. Negrón: What did you do with that deed when Mr. Suau gave it to you?

"Witness: I read it all and called my brother. 'Look here, boy, what is this?' He said, 'I know nothing about this.' I said, 'My golly, how is this possible?'

"Who said that?

"I did. 'That behind our backs!'

"Your brother, what did he say?

"Ah! that he knew nothing about it either. 'No, no, I know nothing about that deed, nor that they were going to sign a contract, nor anything,' Then I went to see Mr. Acosta Velarde.

"When you went, when you read the deed in Suau's office, you said, upon questioning by colleague Acosta Velarde, that you were surprised, that you were surprised to the point that 'Give me a copy of that deed in order to show it to my brother.'

"Yes, that's correct. Imagine! We did not know for how much they had sold, nor under what terms they had sold. Well, nothing.

"Mr. Negrón: So, at that moment your intention was to show the copy of the deed to your brother?

"Naturally, of course!

"When, then, did you decide to file an action of redemption?

"As soon as I talked with Acosta Velarde. I said to him, 'Look what they have done behind my back!'"

*For defendant:* His first witness was Notary Salvador Suau Carbonell. He testified essentially: That he knows the brothers and sisters Sara, Antonia, Segismundo, and José Ramón Quiñones; as notary he authorized deed No. 7, on sale of interests, executed in his notarial office in San Juan on May 25, 1954, by the first two as vendors and Rosendo Quiñones Irizarry as purchaser; he did not recall seeing the letter of May 19, 1954, which Mr. Souffront wrote to Sara Quiñones; after executing the deed of sale he told the executing parties "that the contract had been executed and that they had to serve notice in an authentic manner on the other co-owners of the property to enable them to exercise the right of redemption to which they were entitled pursuant to the Civil Code within nine days after notice thereof"; to that effect, he dictated a letter of notice addressed to José Ramón and Segismundo Quiñones, to be signed by Sara and Antonia Quiñones, informing the former "of the execution just authorized before me on that same date and by the deed herein presented"; that letter was "delivered to Doña Antonia to be registered and mailed"; he denied having written a letter on April 23, 1954; he recalled that Rosendo "spoke to me about something mentioned in this letter of Souffront; and that the matter had already been settled in Souffront's office."

On cross-examination by plaintiffs' attorney, he testified that he had not sent the letter of notification written on May 25; that afterwards he learned that it had not reached the hands of José Ramón and Segismundo Quiñones from the first one of them *"when he came to my office some weeks later and asked me if such instrument or deed of conveyance existed,* and I told him that it did, I informed him of the date, and he said to me 'I have learned through other channels of the execution of that deed, please give me a copy right away, and I'll send for it.' I issued him a copy on June 12, I believe."

244

Antonia Quiñones was the second witness for defendant. She testified that she received Rosendo's letter offering to buy her share. The text of that letter appears in footnote 1, p. 233. She did not attach importance to the letter because "he was buying something which I did not know existed"; that they consulted Mr. Salvador Suau who told her "that it did exist, that there were certain requirements"; that on April 23, 1954, Suau wrote a letter to José Ramón and Segismundo Quiñones in connection with the sale of the interests;[10] that in the evening—April 23, 1954—she went to her brother's house and told him about her conversation with Suau; that Segismundo read the letter twice "written by Suau," and he said to her, "No, I'm not interested in

[10] This letter, which Mr. Suau claimed not to have written, copied verbatim reads:

"April 23, 1954

Messrs. José Ramón Quiñones
and Segismundo Quiñones
c/o of WAPA Station
San Juan, Puerto Rico

Dear Brothers:

The purpose of this letter is to inform you that we received recently from our cousin, Rosendo Quiñones Irizarry, an offer to buy our interests in the three parcels of land which altogether add up to 75.96 cuerdas, situated in the ward of Sabana Grande Abajo of the Municipal District of San Germán. Rosendo's offer is $2,000 for each interest, and considering that this offer is convenient and acceptable to us we are willing to sell those interests to our counsin, Rosendo Quiñones Irizarry. This is information to both of you for pertinent legal purposes, since we plan to execute at any moment the deed of sale in his favor.

Awaiting a reply on the matter, we remain Your loving sisters."

Two carbon copies of that letter were admitted as exhibits U and V of defendant. Attached to copy marked V is a letter written by Sara Quiñones, which was marked exhibit W and which reads:

"Dear Rosendo:

In case it should be useful to your lawyer, this is the letter for Segis dictated by Suau which we did not send him because Segis spoke with Toña and me and told us that he had no objection to selling, but it was signed with everything else to be attached thereto, but he said it was not necessary at that time. Upon receipt of Souffront's letter, Mon's letter was not sent either. Sara."

this at all," and that "he would speak to my brother Mon"; that she said to him, "Do it"; "that days passed and he did not answer me"; that then she called Segismundo, and the latter told her that it was difficult to get hold of his brother and that he did not see him; that he would see him one of these days; he told that to his sister Sara, and the latter said to him "I'll fix it. Just wait and I'll fix it"; that "some time later, one or two weeks . . . she called me and said "I have a letter from Souffront telling me that he spoke with Mon and everything is settled; hurry and go and see Suau, he wants you to sign, that I'm on my way. I went to Suau's and signed the deed"; that Suau prepared the letter of April 23 and the deed and "nothing else"; that she did not speak with her brother Mon in connection with the transaction; that she kept the letter which Segis read, and put away among her papers a copy which she afterwards gave to defendant.

The last witness for defendant, regarding the facts determined in the first two findings, was defendant himself. On direct examination he testified that he wrote and sent to Sara and Antonia Quiñones the letters of April 13, 1954, offering to buy their shares; that on April 23, 1954, he saw Sara and Antonia in San Juan and in the house of his brother Norberto, and then went to Suau's notarial office; that the latter suggested that "Mon and Segis should be informed about the purchase"; that Suau dictated a letter that day addressed to José Ramón and Segismundo Quiñones which Antonia "considered very serious," and she said that she would speak personally to her brother Segismundo; that afterwards they called him to return to San Juan "because they had a letter from Souffront"; that when he came to San Juan on May 25, 1954, Sara told him "that they had spoken with Segis, and Segis promised to talk to Mon"; that he called Souffront by telephone to San Juan; Souffront went to San Juan and spoke with Mon; that when Souffront

came to Mayagüez he wrote what the letter says; that that day and in the house of his brother Norberto, Sara showed him Souffront's letter, and that Toña had said that he should go to Suau's office for the purpose of executing the sale of the interests; that there Sara showed Souffront's letter to Suau and the latter read it; that the deed was signed that day, May 25, and that Suau, after seeing the letter, said that with that letter "there is no problem, the deed can be executed"; that Suau did not dictate any letter that day, nor did Sara or Antonia sign any letter that day about the sale, and we all "came out together that day from Suau's office"; that the only letter written by Suau was that of April 23; that he returned to Mayagüez the same day, May 25, and the next day he went to see Souffront and told him that he had purchased the interests of Sara and Antonia, and showed the "deed to Mr. Souffront" and asked him to notify Mon not to operate the lands which he had purchased, that he wanted to have free access to the property and that he told it to Alberto Márquez, "overseer and a close friend of Mon"; that he commissioned Mr. Souffront to advise Mon "to mark the boundaries of that parcel as soon as possible because I wanted to have access to the seven cuerdas which I had to cultivate"; that he went to see Souffront because "Souffront has always handled his matters; since they are close friends and he is the only one, the person closest to him, they communicate"; that he did not try to see José Ramón Quiñones personally, and that the latter "did not speak to me" ever since "he gave me the 16 cuerdas"; that Alberto Márquez is the administrator of all the properties of José Ramón Quiñones and was familiar with his problems; that on May 26 he took the deed to Souffront and explained the transaction to him, and Souffront read it that day.

On cross-examination he testified that he went alone to see Alberto Márquez and showed him the deed of purchase of the interests, and Márquez read it; that he went to see

the latter "because Quiñones is not on speaking terms with me."

As evidence in rebuttal, the redeemers offered the testimony of Alberto Márquez to whom Rosendo made reference in his testimony. Márquez said, among other things, that he was a farmer and was engaged in the operation of a farm of which he was co-owner; that he did not have authorization or a written power of attorney from José Ramón Quiñones, nor was his employee, nor received any salary from him, but that he had helped him since 1944 in the operation of the farms at the request of the Farmers' Association; "I handle any problem for him which may arise"; that he knows Rosendo Quiñones and that the latter and his wife had gone to his house one evening; that Rosendo never showed him any instrument of purchase of lands, nor showed him any deed; that the purpose of that visit was to ask him for authorization to take out his cane by an alley belonging to José Ramón Quiñones; that Rosendo never told him about the purchase of the interests from Sara and Antonia Quiñones; that whenever Rosendo asked him for permission to cross the property, "some times, since I had no authorization, I even contacted Mr. Quiñones."

On cross-examination he testified that the overseer of Quiñones' properties was Ramón Collado; that the latter paid the workers of the property with the money which he went to get in the bank of Mayagüez; that his office is separate from that of José Ramón Quiñones, and that the latter paid him nothing "for the administration," and that he had helped him 14 years "without charging a single penny" in consideration of the help which Quiñones had given to the farmers "in a very difficult situation," having neglected his interests for the defense of the agricultural class in connection with which "Quiñones spends a lot out of his own pocket," and for that reason I rendered services to him without pay; that Rosendo never showed him any deed, nor asked him to fix

the boundaries; he repeated that in order to give permission to Rosendo he had to consult Quiñones because he was not his agent.

As thus summed up, that was the essential evidence offered by the parties on the facts occurring between April 13, 1954, when Rosendo offered to buy the interests, and June 15, 1954, when the action of redemption was brought by José Ramón and Segismundo Quiñones.

It will be observed that there are marked contradictions between one evidence and the other respecting several points; some times that of one party is also conflicting. However, the trial judge settled those contradictions and conflicts in favor of plaintiffs-appellees in the process of weighing the probative force and the preponderance of the evidence.

The first finding of fact is not actually challenged. It determines facts alleged in the complaint and admitted in the answer relative to the execution of the deed of sale which gave rise to the redemption, and the fact that that deed was not recorded in the Registry of Property.

In our opinion, findings of fact Nos. 2 and 3 are fully supported by the evidence presented and believed by the trial court. It does not appear from any evidence, even giving full and unconditional credit to the entire evidence presented by defendant, that the brothers José Ramón and Segismundo Quiñones expressly, clearly, conclusively, and definitively "signified their decision not to buy the interests object of the redemption and consented to the sale to appellant," as asserted by the latter—without it being necessary for the moment to discuss its objectionable validity and obstructive efficacy in the exercise of the action of redemption after the right to redeem has arisen. The letter written by Souffront on May 19, 1954, does not reveal such a decision and absolute consent; it merely says that Segismundo would decide whether to make use of the right of redemption of co-owners and to buy the shares or consent to the sale. This

letter was sent the same day of May 19, 1954. As of that date neither Sara, nor Antonia, nor Rosendo, nor Souffront spoke with Segismundo, nor did the latter get in touch with them. The last time Antonia spoke with him was a few days before Souffront wrote that letter.

Mr. Souffront himself, when cross-examined respecting the contents of that letter as to whether the authorization of José Ramón Quiñones "was given according to this letter," answered: "No, depending on the interest which Segismundo may have." Tr. Ev., piece 1, p. 70.

There was no evidence that José Ramón and Segismundo Quiñones learned of the sale of the interests "prior to the execution of the deed of sale—without discussing at this time the juridical consequence of such previous knowledge—and that they were served with notice of the execution of the deed on May 26, 1954, or more than nine days prior to the filing of the action of redemption," as also asserted by appellant. First, because it is impossible to learn of a fact which has not occurred as yet and much less since he was absent from Puerto Rico; second, because the only communication to José Ramón Quiñones concerning the sale which could bind him at law, if found sufficient, was that made by Souffront, his close friend, *compadre*, attorney at law and notary, and "almost a brother," by telephone on the morning of June 10, 1954, merely giving him the news of the sale and the name of the authorizing notary, which news José Ramón Quiñones transmitted immediately to Segismundo.

Obviously, the assertion made by Rosendo Quiñones Irizarry that he informed Souffront in detail of the sale and that the latter read the deed of May 26, one day after it was executed, and that afterwards he did likewise with Alberto Márquez, was not believed by the trial court, apart from the fact that the mere knowledge of the sale by these persons would never constitute the starting point for counting the nine days to exercise the action.

The evidence reveals strange circumstances which were not the ideal ones for the two Quiñones brothers to have prompt· and exact knowledge of the alienation: (1) it was executed after José Ramón Quiñones left for the United States; (2) the deed was not presented for registration; (3) the letter of notification of the sale which Notary Suau claims to have written on the day of the sale was not sent to them (the letter of April 23, 1954, informing them of Rosendo's offer, was not sent either), advising its immediate remittance by registered mail; (4) Rosendo informed Souffront about the execution of the sale after the lapse of 15 days; (5) neither Antonia nor Rosendo was "on speaking terms" with José Ramón Quiñones.

The uncontroverted oral ·and documentary evidence of redeemers as to the fact that the first time they learned of the execution of the sale of the interests was on June 10, 1954, and that it was· not until June 11 and 12 that they had full and complete knowledge of the alienation, is very convincing. It consisted (1) of the testimony of José Ramón Quiñones and of Mr. Souffront concerning the telephone call of June 10, 1954, by the latter to the former, corroborated in part by the statement of long-distance calls corresponding to June 1954 prepared by the telephone company—exhibit 6 of plaintiffs—in connection with the telephone of the office of that attorney; (2) of the telephone conversations between José Ramón Quiñones and Mr. Eusebio López Acosta, of San Germán, of that same day and of the following June 11, corroborated by the other statement of long-distance calls of June 1954 of the office of redeemer José Ramón Quiñones— exhibit 15 of plaintiffs; by the telegram of June 10, 1954, which López Acosta sent from San Germán to José Ramón Quiñones—exhibit 7 of plaintiffs; by the letter from López Acosta of June 10, 1954, to José Ramón Quiñones—exhibit 8 of plaintiffs; and by the letter of June 11 from Quiñones to López Acosta—exhibit 16 of plaintiffs; and, lastly, (3) of

the testimony of Notary Salvador Suau Carbonell, witness for defendant Rosendo Quiñones, corroborated by the date—June 12, 1954—of his certification of the copy of the deed of sale—exhibit 2 of plaintiffs—requested the day before by José Ramón Quiñones, and by the "note of issuance" made in his protocol on June 12, namely, three days prior to the filing of the action of redemption.

Appellant is right in asserting in his brief—p. 25—that the trial court erred in concluding that at the time the sale was executed the Quiñones brothers were "considering whether or not to buy." The evidence does not warrant such a finding. However, what the evidence does establish is that at the time the alienation was executed any and all consideration of the problem between the two Quiñones brothers was postponed and pending the return of José Ramón Quiñones from the United States. As testified, in part, by Segismundo: "I spoke with my sister Antonia, about one week or eight days later I spoke with my brother about what my sister had told me. He then said to me, 'We are going to consider that.' It remained like that and he left for the United States"—Tr. Ev., piece 1, pp. 164–65. Under those circumstances, that harmless error does not affect the substantial rights of any party and we could disregard the same pursuant to Rule 50.

■ After the careful study and analysis which we have made of the entire oral and documentary evidence offered by both parties, and after considering in the light thereof the grounds of the challenges of the three remaining findings of fact, and giving due consideration to the opportunity which the trial court had to judge of the credibility of the witnesses (and of evaluating the probative force of the documentary evidence, without such evaluation being always binding on us), in our opinion the remaining findings are also amply supported by the evidence, are not clearly erroneous, nor do we find substantial reasons for disturbing

the same, and all of them represent the most adequate, rational, and logical set of facts permitted by the evidence introduced in the action. We need not make a detailed exposition of the evidence on each one of them as we have done in connection with the other three. On some of them—Nos. 8, 9, and 10—appellant himself admitted that the error attributable by him "is not important in the delucidation of the essential points of the controversy in this case"—p. 26 of the brief.

As sequel, we shall not adopt any of the "Findings of Fact Omitted" which appellant now proposes to substitute in part for those of the trial court and which at no time did he propose before that court. Some are based on facts which in his opinion are supported by the evidence but which the trial court obviously refused to find proved. The omission of others is not error.

## II

We turn next to consider the errors attributed to the conclusions of law. The trial court made, separately, five conclusions on the action of legal redemption and six on the actions comprised in the counterclaim. The text of the former is as follows:

"*Conclusions of Law.*

"The action of redemption brought by plaintiffs is worthy of merit, since it was timely filed, wherefore the action against defendant is proper since he is a stranger to the community.

"1. Section 1414 of the Civil Code grants a period of nine days to bring action, counted, in a case such as this in which the sale was not recorded in the Registry, '*from the time the redeemer may have had knowledge of the sale,*' and in the case at bar the uncontroverted evidence has shown that plaintiffs had knowledge of the sale of the interests of their sisters to defendant on June 10, 1954, the action of redemption having been filed five days later.

"2. The fact that plaintiffs had knowledge some days prior to the execution of the sale of those interests that their sisters intended to sell them and that defendant wished to buy, does not affect plaintiffs' right to exercise the action of redemption, since their right to redeem the interests did not arise until after the sale was executed, 4 Castán, *Derecho Civil Español* 142 (1952 ed.); 10 Manresa, *Comentarios al Código Civil* 395 (rev. 5th ed.), in which case it cannot be held, on the basis of the evidence presented, that plaintiffs had waived their right to acquire the interests of their sisters before the latter would sell to defendant (see findings of fact Nos. 2, 3, and 4).

"3. The action of redemption lies against defendant because he is a stranger to the community. The deed of division of community whereby plaintiff adjudicated to defendant in 1944 a parcel of 16.75 cuerdas in payment of his share of one-fourth in these three properties object of the action of redemption is valid, since plaintiff José Ramón Quiñones had sufficient authorization from the other co-owners to carry out that transaction (see finding of fact No. 12), the appearance of Francisca Quiñones Guzmán in that deed being unnecessary, since the obligation assumed by plaintiff José Ramón Quiñones for the payment of a life pension to Francisca only encumbered the share of said plaintiff in these properties, and such charge remained unaltered at the time the community was divided (see finding of fact No. 12).

"4. The fact that plaintiff had no written authorization from his sister Sara to appear in that deed is no ground either to challenge the validity of that instrument by defendant. José Ramón Quiñones testified that he had verbal authorization from his sister to carry out the transaction, no evidence having been presented to establish the fact that she questioned at any time, in the course of all those years, her brother's alleged authority, since § 1601 of the Civil Code expressly provides that an *express* agency may be given by *parol*, which is the only requirement necessary for an agent to alienate or dispose of real property, § 1604 of the Civil Code, the only inconvenience of the parol agency being that it precludes the registration of the transaction carried out by the agent to the detriment of third parties, it being subject further that the certainty of the agency be challenged in the future by the alleged principal, as a result of

which the contract may be voidable. *Colón* v. *Registrar of Property*, 18 P.R.R. 123.

"5. And even assuming that the lack of sufficient authorization from Sara Quiñones and Francisca Quiñones Guzmán may be a ground for invalidation of the deed of division of community, we are of the opinion that defendant's challenge should not prosper since Francisca Quiñones died in 1954 before the present action was filed, any real right which could have existed in favor of his aunt being consolidated in plaintiff José Ramón Quiñones, defendant being precluded from raising the question of lack of sufficient authorization from Sara, since only Sara Quiñones could do so, particularly considering that she was not joined as a party in this action nor was produced as a witness by either party, and that defendant is also prevented, by his conduct in accepting that transaction as valid during all these years (see finding of fact No. 16), from challenging at this time the validity of that contract. *Zayas* v. *Orraca,* 80 P.R.R. 327, 335, and judgments of March 14, 1911 of the Supreme Court of Spain. And in any event, even though defendant had standing to raise this question at this time, the challenge of this contract by defendant, made for the first time more than 11 years after the transaction was carried out, would have prescribed pursuant to the provisions of § 1251 or § 1253 of the Civil Code, which fix a four-year period to exercise this action."

Finding of fact No. 1 determines that the action of redemption was brought within the period fixed by § 1414 of our Civil Code; No. 2, that the redeemers did not waive the right of redemption.

Appellant challenges the first finding on the ground that that period had expired when the action was brought, which period should be computed as of the date of the deed of sale, namely, May 25, 1954. The second, because "appellants had waived their right of redemption." He adds that the trial court "through error did not hold that appellees were bound to establish in the action, as a fact, their promise not to sell the interests redeemed during four years."

Appellant is not right. Section 1414 of our Civil Code provides that "the right of legal redemption cannot be exer-

cised except within nine days, counted from the entry in the registry, and in the absence thereof from the time the redeemer may have had knowledge of the sale." The trial court concluded that the redeemers first had knowledge of the sale on Thursday, June 10, 1954. The action was brought on Tuesday, June 15, or the fifth day of the legal period.[11]

Even though it had been judicially concluded that Rosendo informed Souffront and Alberto Márquez on May 26 and that the latter read the deed of sale on that day, it would not have been possible under any circumstance to determine that the mere knowledge of those two persons bound the Quiñones brothers at law. Of course, if it had been determined that Rosendo actually got in touch with them on that day of May 26, and also that on that day or any other day prior to June 6, 1954 Souffront or Márquez transmitted Rosendo's information to the redeemers, in that case

---

[11] Inasmuch as this period expired on Saturday, June 19, at law it expired on Monday, June 21, 1954. Actually the period started to run on June 11 when redeemer José Ramón Quiñones called at the office of Notary Suau where he read the deed of sale and had full and exact knowledge of the terms and conditions thereof, which enabled him to decide on the advisability of whether to exercise or not the action of legal redemption.

From the judgment of December 3, 1955, of the Supreme Court of Spain we cite the following:

"The concise expression 'from the time the redeemer may have had knowledge of the sale' is not to be taken in the sense that the period within which to demand the redemption starts to run, upon expiration of the redeemer's action by prescription, from the moment he has knowledge of the fact of the alienation even though he is not acquainted with the terms and conditions thereof, *since having knowledge in such an elementary way that a thing has been sold does not mean to have sufficient knowledge of the sale to determine the advisability of substituting the purchaser in the rights and obligations which compose the contractual content and the right of subrogation* which is, according to the definition of redemption of § 1521 of the Civil Code, *what presupposes that the redeemer must have knowledge of the obligations contracted by the purchaser in whose place he shall be subrogated, as they are known by the publicity of the Registry of Property by virtue of the registration.*" (Italics ours.)

the right of redemption would have prescribed by the following June 15.

■ It is not, as stated by appellant, that "the period started to run as of the day of execution of the deed and of the sale." One thing is the accrual of the right to redeem defined by § 1411 of the Civil Code and another thing is to exercise the action to assert the right regulated by § 1414. The time to do the latter may not coincide with the time of the former. The fatal nine-day period of prescription is not counted as of the day the alienation is executed but from the date of registration,[12] or in lieu thereof as of the time the redeemer has knowledge of the sale.[13]

In holding that the action of legal redemption was timely exercised, the trial court correctly applied § 1414 of the Civil Code.

---

[12] The judgment of September 30, 1960, of the Supreme Court of Spain, reads in part:

"Legal redemption arises from the moment the sale of the thing is carried out, wherefore it is evident that the period for exercising the right of redemption should be counted as of the date of such knowledge rather than as of the date of registration; and it should not be understood that in all cases of registration the date thereof is the starting point for counting the period, except only in those cases where, it not being able to establish whether or not the redeemer had prior knowledge, it was necessary, for the protection of the property, to establish a presumption *juris et de iure* of the knowledge based on the publicity of the registry, since otherwise more importance would be attached to a mere assumption of the law than to the real and actual fact of the knowledge of the sale fully accredited."

[13] The doctrine announced in *Rosaly v. Ríos*, 63 P.R.R. 801, 806 (1944), cited by appellant, does not favor him. In that case, on September 30, 1941 a certain interest was sold at public auction; the redeemer then had knowledge of the sale; the deed of judicial sale was executed on the following October 29; the action of redemption was brought on November 6. "Prescription" having been invoked on the ground that nine days should be counted as of September 30, the date on which plaintiff had knowledge of the sale, we held that the period had not expired since it has started to run on October 26, the date the sale was consummated, rather than as of September 30, the day the sale was perfected. In the instant appeal the alienation was perfected and consummated in the same act of May 25, 1954, while the redeemer having a greater interest was outside of Puerto Rico.

■ Appellant is not right either in alleging that the redeemers had waived their right of redemption. It is correct that the second paragraph of § 4 of the Civil Code provides that the rights granted by the law may be renounced, provided such renunciation is not contrary to law, to public interest, or public order, or prejudicial to a third person. But such renunciation of rights authorized by that section must be clear, conclusive, express, and unequivocal. Although it is conceded that it may be express or implied, the waiver of rights is not generally presumed and is of strict application.[14] It is not fair to infer it from expressions of doubtful meaning. Assuming that a right of legal redemption which has not arisen is waivable, without any concretion, the future existence of which does not depend on any act of the waiving party but on the exclusive and independent will of the co-owner who can sell, there is no circumstance in the evidence constituting an express, clear and conclusive waiver. The most that may be said is that the sisters Sara and Antonia Quiñones informed their brothers José Ramón and Segismundo that their cousin, Rosendo Quiñones, offered to buy their interests, and that if they did not buy they would sell them to Rosendo; in other words, either you buy or we sell to Rosendo; that Segismundo said "that he did not wish to buy," and José Ramón that "he would speak about it to his brother upon his return from the United States." Let us suppose that both had informed their sisters, clearly and categorically, that they did not wish to buy their interests. Would they forfeit automatically for that reason the right of redemption after the sale was executed in favor of Rosendo?

In *Vellón* v. *Central Pasto Viejo*, 34 P.R.R. 226, 227 (1925), we decided this question in the negative. That appeal involved an action of legal redemption by co-owners. The redeemer had acquired by purchase a certain rural

---

[14] See *Cabrera* v. *Doval*, 76 P.R.R. 728, 731 (1954).

property during the marriage. His wife died and part of the property was inherited by some relatives. The latter offered to sell their interests to the redeeming widower and the latter refused to buy. Then they sold their undivided shares of the property to Central Pasto Viejo. The widower exercised in due time his action of legal redemption of co-owners against the purchaser. The redemption was ordered. Defendant appealed to this Court and assigned as second error the failure of the trial court to rule that plaintiff waived his right of redemption by his refusal to purchase from the heirs. On this point we held:

"In considering the assignments we shall change the order in which they were made. In our opinion the second assignment is without merit because it is not contrary to the spirit of the law for a co-owner who has refused to purchase from another to decide, after the latter has sold to a stranger, to assert his right of redemption in order to prevent the stranger from becoming a joint owner. *In no sense can it be understood that by refusing to purchase from his co-owner he waived his right of redemption which accrued when the sale was made to a stranger.* The appellant cites no law in support of its contention." (Italics ours.)

■ The trial court did not err in failing to hold that plaintiffs were bound to establish at a trial, as a fact, their promise "not to sell the interests redeemed during four years," as alleged by appellant.

In paragraph 5 of the complaint of redemption it was alleged: "That plaintiffs bind themselves not to sell during four years the interests object of this redemption." This special requirement for the exercise of the legal redemption of co-owners—it is not required in the other types of redemption—is a specific norm which binds the redeemer to agree not to sell within four years the share of the interest which he may redeem. It imposes a formal obligation which must be met in the complaint in order to establish the seriousness of the redeemer's interest.

Regarding the declaration of that promise, defendant merely stated in his answer: "The allegation made in the preceding paragraph—in the preceding paragraph he alleged, briefly, that he was not a stranger to the community and, on the contrary, that he continued to be co-owner against whom the redemption did not lie—is reproduced in opposition to the fifth averment of the complaint."

In *Zalduondo* v. *Iturregui*, 83 P.R.R. 1, 21 (1961), in a similar situation—subsequent to the filing of appellant's brief—we held:

"Redemption should not be exercised for speculative purposes. One of its purposes is to eliminate common ownership, which as Escriche says in his Dictionary, 'is usually a perennial source of discord.' As means to avoid speculation, the redeemer, prior to 1855, was requested an oath to the effect that he wanted the property for himself and it was not redeemed for speculative purposes. That measure and others were incorporated to the former law of procedural to insure the compliance with the restriction against transfer for those four years. Following previous decisions we decided in *Noble* v. *Rodríguez*, *supra* at 456–57, that the complaint must allege that the redeemer binds himself not to sell.

"The appellant did not attack the promise on the ground that it was false or deceitful or because there existed an speculative purpose. We repeat, he merely stated that he had nothing to say against it because it was a conclusion of law. As we understand what constitutes a conclusion of law, we cannot accept that the simple declaration of a promise not to sell may be considered thus. That position of the defendant did not create controversy in regards to the promise not to sell contained in the complaints. On the other hand, if the assumption of that obligation is a substantive requirement necessary in that action, the manner in which the same was contracted is correct. Under the circumstances of the case at bar we see no need of implementing in court, an obligation already duly contracted. It is true that the judgment made no provision in that regard. But that does not preclude us from modifying it properly."

■ At the outset we said that in answer to the averment of the complaint asserting that Rosendo Quiñones Irizarry was a stranger to the community of property composed of the two Quiñones brothers and the two Quiñones sisters over the three parcels of land, the former alleged that he was not and that, on the contrary, at the time of acquiring the interests of Sara and Antonia he was a co-owner of those parcels. In its conclusions of law Nos. 3, 4, and 5, copied above, the trial court determined that he was a stranger, and that judgment should be rendered against him and in favor of redemption. For a better understanding of the problem, we give below the juridical history of those three parcels as it appears from the documentary evidence in the record.

In 1892 José Ramón Quiñones Quiñones and his wife, Francisca Guzmán, paternal grandparents of the contending parties, were the owners of those three parcels and of other properties. They died that year and were succeeded by their six children named Rosendo, Tomás Ramón Canturriense, Francisco Mariano, María de los Dolores, known as Francisca and Paca, Carlos Eladio, and José Eladio Quiñones Guzmán. In 1894 these six children proceeded to divide the hereditary property, adjudicating those three undivided parcels and in equal parts to the four brothers and sisters named Rosendo, Tomás Ramón Canturriense, Francisco Mariano, and María de los Dolores. The hereditary shares corresponding to Carlos Eladio and José Eladio were adjudicated to them in other properties.

The son, Rosendo, died in November 1913 and his interest of one-fourth in the three parcels passed to his three children, Norberto Alfredo, Rosendo de Jesús—appellant herein—and Rafael Ángel Quiñones Irizarry. When his inheritance was divided among the latter in July 1923, the entire undivided one-fourth was adjudicated to Rosendo de Jesús, known as Rosendo Quiñones Irizarry.

The son, Tomás Ramón Canturriense, died under will in June 1918 during his marriage to Antonia Quiñones. When his properties were judicially distributed in 1918, the interest of this predecessor of one-fourth of those three parcels was adjudicated in naked ownership, in equal parts, to his four children, Sara, Antonia, Segismundo, and José Ramón Quiñones Quiñones. The useful ownership or usufruct of that entire interest was adjudicated to the testator's brother, Francisco Mariano, and his sister, María de los Dolores Quiñones Guzmán. (The parties admitted that Doña María also had, at least nominally, the usufruct of one-fourth belonging to her brother, Rosendo Quiñones Guzmán, which finally passed to appellant Rosendo Quiñones Irizarry.)

The son, Francisco Mariano Quiñones Guzmán, died on May 31, 1922, under open will executed in February 1919 before Notary Oscar Souffront, instituting as sole and universal heir his sister, María de los Dolores, and his interest of one-fourth and the aforesaid usufruct passed to her.

The surviving daughter, María de los Dolores, after inheriting in 1922 from her brother, Francisco Mariano, had become absolute owner of an undivided one-half of the three parcels and of the usufruct of the one-fourth inherited by the heirs of her brother Rosendo and of the remaining one-fourth inherited by the heirs of her other brother, Tomás Ramón Canturriense.

By instrument executed in the city of Barcelona, Spain, on September 3, 1941, before Temple Wanamaker, Jr., Vice Consul of the United States in that city, María de los Dolores Quiñones Guzmán, as owner of 11 rural properties situated in the Municipal District of San Germán and also of an undivided one-half, in full ownership, and of the usufruct from the remaining undivided one-half, sold to her nephew, coredeemer José Ramón Quiñones Quiñones, all the 11 properties and her undivided shares, in full ownership, and the usufruct from the three parcels "in consideration of an an-

nuity of four hundred dollars a month which Quiñones shall bind himself to pay to the executing party for life," on condition that the purchaser bind himself "to accept this contract within a period of six months counted as of the day hereof." José Ramón Quiñones did in fact accept and ratify the contract by public deed of October 20, 1941. The value, as a whole, of the properties and rights so transmitted was fixed at $56,200. Up to her death in January 1954, María de los Dolores had received from José Ramón Quiñones "as life pension agreed upon as selling price . . . a total sum of some $60,000."

The undivided shares or parts of the community of property in the three rural properties involved in the redemption, existing in May 1954 among the four Quiñones brothers and sisters and their cousin, Rosendo Quiñones Irizarry, were as follows: 9/16 belonged to José Ramón, 1/16 to Sara, 1/16 to Antonia, 1/16 to Segismundo, 4/16 to Rosendo, exclusive of the usufruct rights transmitted to the first by his aunt María.

In the middle of 1942 Rosendo demanded the material delivery of his share of the community. After the Quiñones brothers and sisters consulted among themselves, they agreed to do so. Civil engineer José D. Morales surveyed the properties and set up a plan; a parcel of 16.75 cuerdas was segregated from the larger parcel the area of which was reduced to 49.75 cuerdas, and by mutual agreement the material possession of the parcel segregated of 16.75 cuerdas was delivered to Rosendo in full settlement of all his rights and shares in the properties of the community, as a result of which he withdrew permanently therefrom and the community was continued, as respects the remainder of the main property and the other two small properties, by Sara, Antonia, Segismundo, and José Ramón in the proportion corresponding to them in the common thing.

Rosendo started to operate, and operated as absolute owner, his parcel of 16.75 cuerdas. In June 1942 he asked the Quiñones brothers and sisters to set forth in a public instrument the material division carried out. See note 18. To that end, public deed No. 6, entitled "Division of Community," was executed in Mayagüez on January 21, 1944, before Notary Oscar Souffront, in which there appeared as only executing parties: party of the first part, José Ramón Quiñones Quiñones, in his own right, and also as agent for his aunt María, for his mother, Antonia Quiñones widow of Quiñones, and for his sisters Sara and Antonia, and his brother Segismundo; and as party of the second part, appellant Rosendo Quiñones Irizarry. In the FIRST paragraph of that deed it was set forth that Rosendo was "owner of an interest of an undivided one-fourth in each one" of the three properties described in the complaint of redemption. The manner in which Rosendo had acquired that interest was set forth in the SECOND paragraph. In the THIRD it was set forth verbatim:

"THIRD. That the appearing party, José Ramón Quiñones Quiñones, is the owner of one-half of each one of the three properties described under letters A, B, and C, that is, he owns an interest of an undivided one-half in each one of the three properties, which he acquired in the manner appearing from the deed executed in the city of Barcelona, Spain, on September three nineteen hundred and forty-one, before the Vice Consul of the United States of America in that city, Mr. Temple Wanamaker, Jr., by María de los Dolores Quiñones Guzmán, known as Doña Francisca or Doña Paca Quiñones, which deed was duly ratified by deed number one hundred forty-five executed in Mayagüez on the twentieth day of October nineteen hundred and forty-one before the certifying Notary. The said interests acquired by the appearing party, Quiñones-Quiñones, are subject to the right of usufruct constituted in favor of the said María de los Dolores Quiñones Guzmán, known as Doña Francisca or Doña Paca Quiñones, by the same aforesaid deed; and the succession of Tomás Quiñones Guzmán, composed of the

persons already mentioned in the recital of this deed, is the owner of the other interest of an undivided one-fourth in each of the said three properties described above under letters A, B, and C in the first clause of this deed."

In paragraph FOUR it was set forth that "since the appearing party, Rosendo de Jesús Quiñones Irizarry . . . does not wish to remain in the undivided community together with the other co-owners of the three properties . . . the appearing parties, *in the capacity in which they appear*, have agreed to divide the community as respects the said co-owner . . . Don Rosendo . . . and to adjudicate definitively to the said co-owner his share in settlement of his rights in the community in the said three properties; and to that effect and for the purposes already mentioned, the appearing parties, *in the capacity in which they appear*, segregate from the parcel described under letter A—that of 66.50 cuerdas —a parcel of land which, as a separate property and to be recorded as such in the corresponding Registry of Property, is described as follows: "—the parcel of 16.75 cuerdas segregated is described in the deed, and in paragraph FIVE it is appraised at $3,350. The remainder of the main property with an area of 49.75 cuerdas is described in paragraph SIX. In the remaining paragraphs they agreed:

"SEVENTH. The appearing parties, in the capacity in which they appear, agree to adjudicate to the appearing party, Rosendo de Jesús Quiñones Irizarry, known as Rosendo Quiñones Irizarry, for his share in the undivided community in the three properties described above under letters A, B, and C of the first paragraph of this deed, the FRACTION OR PORTION OF LAND segregated from the property described under letter A and in the fourth paragraph of this deed, and to that effect the appearing party, José Ramón Quiñones Quiñones, in his own right and also as attorney-in-fact for María de los Dolores Quiñones Guzmán, known as Doña Francisca or Doña Paca Quiñones Guzmán, and also as attorney in fact for the heirs of Tomás Quiñones Guzmán, composed of his widow, Antonia Quiñones widow of Quiñones, and his children, Sara,

Antonia, Segismundo Quiñones Quiñones, and he himself, adjudicate, convey and transfer in favor of the said Rosendo de Jesús Quiñones Irizarry, known as Rosendo Quiñones Irizarry, each and every right, title, and interest which the said co-owners, José Ramón Quiñones Quiñones, María de los Dolores Quiñones Guzmán, and the heirs of Tomás Quiñones Guzmán, have and which may correspond to them in the parcel of land segregated and described in the fourth paragraph of this deed, in order that the said Rosendo de Jesús Quiñones Irizarry may become the absolute owner, in full dominion, of the said parcel of land and in settlement and adjudication of his share in the undivided community in the three properties above described under letters A, B, and C of the first clause of this deed, and in order that the said parcel of land may be recorded only in his name, as his private property, in the Registry of Property of San Germán; and likewise Rosendo de Jesús Quiñones Irizarry, known as Rosendo Quiñones Irizarry, hereby cedes, adjudicates, and conveys in favor of the other co-owners of the properties described under letters A, B, and C of the first paragraph of this deed, namely, in favor of José Ramón Quiñones Quiñones, María de los Dolores Quiñones Guzmán, known as Doña Francisca or Doña Paca Quiñones Guzmán, and of the succession of Tomás Quiñones Guzmán, composed of his widow, Antonia Quiñones widow of Quiñones, and his children, Sara, Antonia, and Segismundo Quiñones Quiñones, and of the appearing party, José Ramón Quiñones Quiñones in proportion and to the extent of the right of each one of them in the community, each and every right, title, and interest which the said Rosendo de Jesús Quiñones Irizarry had and corresponding to him as such co-owner in the remainder of the main property described under letter A, which remainder is described in the sixth paragraph of this deed, and in the properties described under letters B and C, which by virtue of such conveyance become the property of the following persons: Two-thirds of each one of the said properties belong to the appearing party, José Ramón Quiñones Quiñones, subject to the right of usufruct herein mentioned in favor of María de los Dolores Quiñones Guzmán, known as Doña Francisca or Doña Paca Quiñones, and one-third in favor of the heirs of Tomás Quiñones Guzmán, consisting of his widow,

Antonia Quiñones widow of Quiñones, and of his children, Sara, Antonia, Segismundo, and José Ramón Quiñones Quiñones.

"EIGHT. The appearing parties herein, in the capacity in which they appear, hereby execute mutual and/or reciprocal receipts of payment in full settlement of any claim which they may have among themselves on any account whatever.

"NINE. The appearing parties, in the capacity in which they appear, shall be liable for the eviction and warranty in pursuance of law.

"The appearing party, Rosendo de Jesús Quiñones Irizarry, known as Rosendo Quiñones Irizarry, declares that he accepts this deed in its entirety as being in accord with the agreement, accepting to his satisfaction the adjudication made to him, and likewise his conformity with the full contents of this deed."

We have said that as of the actual division of the community in May 1942 and until its ratification by public deed in January 1944, the four Quiñones brothers and sisters continued on their part in joint ownership of the remainder of the main property and of the other two parcels, and Rosendo on his part continued independently in possession of his parcel of 16.75 cuerdas, all of which they did by just titles, in good faith, quietly, publicly, peacefully, and uninterruptedly. See finding of fact No. 16, p. 230.

On May 2, 1951, Rosendo, by public deed leased his parcel of 16.75 cuerdas to José Quiñones Rodríguez for a period of one year and for an annual rental of $700. As owner thereof, he cultivated and ground in his name the cane produced by that parcel, paid the property taxes thereon and the State Insurance Fund premiums, collected the amount of the canes delivered, the incentive checks, federal compensation on the canes, and the amount of molasses. On February 8, 1956, in answer to a question made in an interrogatory of the party plaintiff, he testified under oath that since April 1942 he materially possessed the parcel of 16.75 cuerdas adjudicated to him, "and I still possess it." In an-

swer to another question, he gave information about the lease referred to.

Twelve years thus elapsed. No one challenged nor questioned during those years the validity, existence, and effectiveness of the material division of the community made in April or May 1942, nor imputed defects of absolute nullity, nor of any other nature, to the deed of ratification of the division executed in January 1944. On April 13, 1954, Rosendo wrote a letter to Sara Quiñones and another to Antonia Quiñones offering to buy their undivided shares in the three parcels, informing one of them, among other things: "My property—he refers to the parcel of 16.75 cuerdas—is so small that your interests jointly with my lands would solve my problem." The complete text appears in note 1. That was the commencement of this judicial controversy.

After the foregoing recital of circumstances duly established at the trial, let us study further the challenges of conclusions of law Nos. 3, 4, and 5 relative to the action of redemption. Appellant alleges that the trial judge erred in concluding therein (1) that José Ramón Quiñones had sufficient authorization from his principals to execute the deed of division of community; (2) that appellant was precluded from alleging such insufficiency; and (3) that the action has prescribed.

If we were to pass judgment on the sufficiency of the powers granted to José Ramón Quiñones by his aunt, María de los Dolores, by his mother, Antonia Quiñones widow of Quiñones, and by his brother and sisters Segismundo, Sara, and Antonia Quiñones, solely on the basis of the nature and extent of the powers granted in the respective powers of attorney,[15] we would have to admit that only the particular

---

[15] The aunt executed it on June 20, 1922, before Notary José Soto Rivera; his mother, on January 20, 1919, before Notary Oscar Souffront, granting him for the second time power of attorney by deed executed on February 24, 1931, also executed before Oscar Souffront; the brother,

and special one given by his sister Sara—"to accept conditional or unconditional gifts of property on behalf of the principal"—was not sufficient to proceed in her name to make the material division of the properties.

Yet, the trial court found proved that his sister Sara had given him verbal powers to represent her in the division.[16]

Segismundo, on April 21, 1927, before Notary Rafael Castro Fernández; the sister Sara, on June 8, 1942, in the city of New York, her power of attorney having been protocolized by deed executed on July 13, 1942, before Notary Salvador Suau Carbonell. Exhibits 3, 4, 5, 18, and 21 of plaintiffs and exhibit N of defendant.

[16] The pertinent part of the testimony of José Ramón Quiñones appertaining to this question (which was not contradicted by his sister Antonia in her testimony as a witness for defendant) and which we take from pp. 276 to 279 and 281 of the transcript, piece 1, is as follows:

"In that deed of division of community whereby you delivered to Rosendo Quiñones a parcel of land of 16 odd cuerdas, namely, the deed executed before Mr. Oscar Souffront, deed No. 6 executed before Mr. Oscar Souffront on January 21, 1944, plaintiffs' exhibit 1, you appear there as attorney-in-fact for the different persons named in that deed. Did you have any power of attorney from your sister Antonia?

"WITNESS: In writing, no. I told her that Rosendo kept bothering and bothering in the sense . . . he wanted his share.

"You mean to say that he bothered you asking for his share?

"Yes, sir.

"Did you have any power of attorney from your sister Sara?

"No, not written, but on the occasion of a trip to the United States I called it to their attention, and then they agreed that I should deliver to Rosendo his share, although I have a power of attorney from my mother accepting and a power from my brother Segismundo, and it was delivered to him.

"THE COURT: You had a legal power of attorney from your mother?

"WITNESS: Yes, sir.

"MR. ACOSTA: Those powers of attorney have been presented in evidence.

"THE COURT: From your sisters you had only one parol authorization?

"WITNESS: I explained the situation to them.

"THE COURT: Did they authorize you?

"WITNESS: And I said, 'Let's get rid of this so he won't bother me any more.' I paid him his share out of my funds.

"MR. ACOSTA: Pardon me just a moment. We want to make it clear.

As to the aunt and the mother of the Quiñones brothers and sisters, we conclude that neither one of them had any right or interest of actual importance in the properties as to require their consent for the division. If he appeared in their name, it could have been due to extreme precaution on his part or on the part of the authorizing notary. The former, Doña María, had conveyed in 1941 all her shares, interests, actions, and rights over those properties to José Ramón Quiñones, without such real property having been encumbered, affected, or subjected in any manner whatsoever to the obligation to pay the annuity. The latter, as widow of Tomás Ramón Canturriense Quiñones Guzmán, never owned a share of the hereditary interest of one-fourth owned by him in those properties and which finally passed, in naked ownership, to her four children, and in usufruct to her brother and sister Francisco Mariano and María de los Dolores Quiñones Guzmán when her estate was divided

---

Did you have a general power of attorney from your two sisters, Sara and Antonia, or from either of them? Yes or no?

"From both of them, no.

"You say that you consulted or spoke with them?

"With Toña in San Juan and with Sara in New York.

"Did you speak with Toña in San Juan and with Sara in New York about the question of delivering to Rosendo the share corresponding to him?

"His share.

"Did they object to that?

"They did not object. On the contrary.

"On the contrary, what did they do?

"When I told them that he kept bothering notwithstanding all these years his lands were leased, he was paid for the lease all these years . . .

"MR. ACOSTA: What did they say?

"WITNESS: That they did not object, that it was all right.

"Did they authorize you? Yes or no?

"They did.

"That is the question.

"Yes.

".          .          .          .          .          .          .

"MR. ACOSTA: And you informed them on the fact?

"WITNESS: I informed them after I delivered the shares to him."

in 1918. Exhibit 19 of Plaintiffs; see Division Folder, pp. 54–68. She waived her usufructuary share.

■ Perhaps José Ramón Quiñones, as such agent, exceeded himself in the use or exercise of his two sisters' authorization. Yet, those principals were bound by their subsequent conduct in ratifying impliedly the division, pursuant to the provisions of § 1618 of the Civil Code.[17] The acts of Sara and Antonia seeking the consent of Segismundo and José Ramón for them to sell to Rosendo in order to prevent redemption because the latter was a stranger to the community as a result of the material division in 1944, and in order that Rosendo could consolidate their interests with the property which was adjudicated to him in that division, a purpose which Rosendo signified to them in the letters of April 23, 1954, constitutes an implied ratification or convalidation of the contract of division (independently of the verbal and express authorization which both of them granted him for the division).

As correctly stated by the trial court in applying § 1601 of the Civil Code which authorizes the express agency "even by parol," the only objection to its constitution in such manner is to prevent that the transaction carried out by the agent be recorded in the registry to the detriment of third persons and that its genuineness be challenged.

The material division of the community carried out under those conditions constituted a valid, effective, and binding contract for the parties and particularly for Rosendo Quiñones Irizarry, who pursued, demanded, and procured the same for his own benefit and who, upon executing and accepting on his part the division and conveyance, accepted

---

[17] This section reads:

"A principal must fulfill all the obligations which the agent may have contracted, within the scope of his authority.

"A principal is liable, in so far as the agent has exceeded his power, only when he ratifies the same, expressly or in an implied manner."

as good and sufficient the appearance and action of José Ramón Quiñones in his own right and as agent for the other co-owners. Sections 1208, 1210, 1211 and 1230 of the Civil Code.

The lapse of more than 10 years since the division of the community in 1942, the continuous acts of Rosendo in his capacity as owner of the property segregated, as well as his leasing the same, his written statements to Sara and Antonia about "my property" and "my lands," without it having occurred to him to allege or invoke such invalidity, were also sufficient to cure in law any defect which would have affected such representation.

The contract of material division whereby Rosendo was permanently separated from the community and became a stranger thereto was juridically agreed upon, perfected, and executed in the middle of 1942, when after surveying the properties with Rosendo's intervention and consent a plan thereof was set up for the purpose of making the segregation, adjudication, and delivery to him of the parcel of 16.75 cuerdas in settlement of his share of the community; the parcel was actually segregated and delivered to Rosendo, and he accepted and received its physical delivery as sole owner thereof, and in that capacity he started immediately to cultivate and operate it. In the making, fulfillment, or execution of that contract there concurred and were substantially observed all the requirements of law necessary and essential for its validity, effectiveness, and compulsoriness between the parties. After one year and six months had elapsed, at the urgent request of Rosendo[18] the division was set forth by

---

[18] In a letter which Rosendo wrote to José Ramón Quiñones on June 15, 1942 (with whom he always gets in touch and consults on matters of division of community), he says among other things:

"Another important matter which I wish to mention to you in this letter is my urgent need for the *Deeds on my interest, already delivered to me*, to enable me to make grinding contracts with the Central, pay my taxes, and procure my quota with the A.A.A. I spoke with Souffront and

public deed of January 1944 authorized by Notary Oscar Souffront, the validity of which is challenged for the first time by him in 1955 by way of defense in the redemption.

■ The contract in question is not therefore null and void, as maintained by appellant in contesting the redemption. Nor even voidable. To make it still more improper, the challenge of nullity is not made by the persons who presumptively and allegedly were unduly represented in the deed of division, the real moving parties of the action of nullity if it actually accrued.

■ The four-year extinctive prescription provided by § 1253 of the Civil Code was also correctly applied by the trial court, if the division of community could have been considered voidable.

Obviously, appellant was, at the time the co-owners transmitted their shares to him and at the time of filing the redemption, a stranger to the community of property constituted over those three parcels by the four Quiñones brothers and sisters, and in so concluding the trial judge did not err. That is why we consider correct conclusions of law Nos. 3, 4, and 5 relative to the action of legal redemption.

### III

Lastly, we shall discuss the errors attributed to the conclusions of law on the counterclaim. Its text:

"COUNTERCLAIM.

"In his counterclaim defendant seeks to challenge the validity of the dominion title of plaintiff José Ramón Quiñones over the properties acquired by the latter in 1941 from his aunt, Francisca Quiñones Guzmán, alleging that both the will whereby

---

he told me that since you have all the papers of the properties, that you should speak with him right away in order to settle this. Since this matter of the deeds is more urgent for me than anything else, I hope you will fix this for me as soon as possible." (Defendant's exhibit CC. Italics by Rosendo himself.)

Doña Francisca inherited those properties from her brother Mariano in 1922, and the transaction whereby Doña Francisca thereafter transmitted in 1941 those properties to plaintiff, are void and that he has the right to inherit part of those properties as one of the intestate heirs of both predecessors.

"1. The action of nullity raised by defendant as to the will of Mariano Quiñones Guzmán who died in 1922, has clearly prescribed. Such action is of personal character and prescribes after 15 years, § 1864 of the Civil Code, *Arroyo* v. *Fernández*, 68 P.R.R. 477, plaintiff José Ramón Quiñones having further consolidated his dominion right to the properties object of the counterclaim by acquisitive prescription for over 30 years, since according to defendant's averments and the facts established at the trial of the case both plaintiff José Ramón Quiñones and Doña Francisca Quiñones possessed those properties uninterruptedly in the capacity of owners since 1922 until the present time. Sections 1859 and 1860 of the Civil Code.

"2. Likewise, the action of nullity with respect to the transaction whereby plaintiff José Ramón Quiñones acquired those properties in 1941 from his aunt Francisca Quiñones Guzmán, does not lie either since plaintiff has consolidated his ownership of these properties by possession for more than 30 years by him and by his predecessor, and further, because plaintiff has possessed those properties since he acquired them from his aunt in 1941 for more than 10 years as owner thereof, with proper title, and good faith. Section 1857 of the Civil Code.

"3. Assuming that plaintiff had not consolidated by prescription his dominion title to these properties, the grounds of nullity of the transaction alleged by the defendant whereby plaintiff acquired these properties from his aunt in 1941, are not supported by the evidence and are insufficient to invalidate plaintiff's title.

"The transaction whereby plaintiff José Ramón Quiñones acquired these properties from his aunt, Francisca Quiñones, should be considered as a contract of sale and not as a gift, said contract having been perfected by instruments executed by both contracting parties in pursuance of the specific terms agreed upon for the transaction (see conclusions of law Nos. 5, 6, and 7), the annuity agreed upon as selling price being a licit and sufficient cause for such contract. 10 Manresa, *Comentarios al Código Civil* 8 (5th ed.), in which this textwriter, sharing

the view of José Castán and Scaevola, asserts that the life income or annuity is recognized as price certain in a contract of sale.

"As it appears from conclusions of law Nos. 13, 14, and 15, the annuity agreed upon as consideration for this alienation was not derisive or unreasonable. But even assuming that at the time of agreeing on this transaction such income was not commensurate with the value of the properties and the vendor's life expectancy, it must be recalled that in the absence of deceit or fraud, of which there is no scintilla of evidence in this case, the fact alone that the price agreed upon may not seem proper and sufficient compensation for the thing sold does not entail the invalidity of a sale, 4 Castán, *Derecho Civil Español* 73 and 74 (1954 ed.); 10 Manresa, *Comentarios al Código Civil* 63, 64, and 74 (5th ed.), particularly if we bear in mind that in the case at bar the reality is that the vendor enjoyed that annuity for more than 12 years receiving a total of some $60,000, which sum is greater than the value of $56,200 at which the vendor herself appraised her properties upon selling them to plaintiff.

"4. Assuming that plaintiff had not acquired by acquisitive prescription absolute dominion title to these properties and that the transaction whereby he acquired them from his aunt in 1941 should be considered as an onerous gift, the validity of the conveyance of title should also be upheld, since the same was executed by the donor and accepted by the donee in public deeds executed in Barcelona and Puerto Rico, respectively, with all formalities required by law within the jurisdiction of which the respective instruments were executed.

"The instrument executed in Barcelona before the Vice Consul of the United States should be considered as a public deed or instrument, § 1170 of the Civil Code, with the same value of authenticity as an instrument executed before a notary the execution of which, as respects the formalities thereof, should not be governed by the Notarial Act of Puerto Rico,[3] but by the pertinent laws of the United States, § 11 of the Civil Code, defendant having failed to show that the consular

---

"[3] Only the instruments executed in Puerto Rico *before a notary* are governed by the solemnities established by our Notarial Act. Section 1171 of the Civil Code."

officer who authorized the instrument failed to comply with the solemnities prescribed by the laws of the United States for the execution of that type of instrument.

"And regarding defendant's averment that notice of the acceptance of the alleged gift was not served on the donor as required by § 575 of the Civil Code, such fact should not entail the nullity of the act since the payment of the annuity by plaintiff and its acceptance by Doña Francisca implies that Doña Francisca had full knowledge of the acceptance of the transaction by her nephew, José Ramón Quiñones.

"5. There is no merit either in the ground of nullity alleged by defendant, based on the nonpayment of the inheritance tax on these properties when Doña Francisca Quiñones inherited them in 1922 from her brother, Mariano Quiñones, and when she conveyed them afterwards to plaintiff José Ramón Quiñones in 1941, the latter on the assumption that this conveyance constitutes a gift rather than a sale.

"The law in force at the time of Mariano Quiñones' death in 1922 was § 379 of the Political Code. That legislative provision prohibited the 'division or distribution' of the estate of any decedent until the inheritance tax was paid; however, that provision did not alter the provisions of §§ 603 and 610 of the Civil Code to the effect that the heirs succeed the decedent in all his rights *'from the moment of his death'* (§ 603), nor did that provision of the Political Code prevent Doña Francisca either from alienating or donating the inherited property without having yet paid the inheritance tax. The Civil Code in § 602 expresses clearly that criterion in establishing, after setting forth in the preceding sections that by the right of succession the heir acquires all the rights and obligations of the deceased, that the heir also acquires 'the right by virtue of which he may take possession of the property of the deceased.' The Supreme Court of Puerto Rico has recognized this principle in numerous cases. Thus, it has held that the heirs have the right, from the very moment of the predecessor's death, to bring actions to revendicate property of the inheritance without the necessity of a previous partition, *Irizarry* v. *Bartolomey*, 32 P.R.R. 849, and that the heirs have the right to sell their hereditary shares from the very moment of the predecessor's death without the necessity of previous partition of the property, *Torres* v. *Registrar*, 75 P.R.R. 121,

the amount of the tax on an inheritance the division of which had already been approved in 1920, and the property was afterwards distributed among the heirs on which the inheritance tax had not been paid,[4] the validity of which division had not been questioned at any time either by the litigants or by the Supreme Court itself, had also been litigated before the Supreme Court of Puerto Rico, *Kessler* v. *Domenech, Treas.*, 49 P.R.R. 189.

"Naturally, the heirs are always liable for payment of that tax, *Blanco* v. *Tax Court*, 72 P.R.R. 799, 806, and also of interest and surcharges whenever payment of the tax is delayed, and The People of Puerto Rico always has a preferential lien on the property of the hereditary estate, which may be sold through the distraint proceeding established by law (13 L.P.R.A. § 898) in the event of default in payment of the tax.

"In the case at bar Mariano Quiñones instituted Doña Francisca Quiñones as his sole and universal heir in his will executed on February 21, 1919 (exhibit E), and as soon as Mariano died in 1922, by virtue of the provisions of the sections *supra* of the Civil Code, Doña Francisca acquired all rights of her predecessor to these properties, and could take possession immediately and dispose of them freely notwithstanding the inheritance tax thereon had not been paid.[5]

"6. In the second cause of action of the counterclaim defendant alleges that plaintiff José Ramón Quiñones has retained for himself a portion of land of not less than two cuerdas of defendant's share in the three properties object of the action of redemption, claiming the ownership of that land and the fruits received therefrom from the time the deed of division of community was executed in 1944 until the present time.

"It is true that before the deed of division of community was executed defendant was in full enjoyment of an undivided share of those properties of about 19 cuerdas, receiving part of the rental on the basis of that proportion. However, that does not necessarily imply that when defendant's share in that

---

"[4] The tax was paid in 1932, when notice of the predecessor's death was served on the Treasurer."

"[5] Regarding the transaction whereby Doña Francisca conveyed these properties to plaintiff José Ramón Quiñones, there is no liability for payment of the taxes, since we have concluded that that transaction was a sale rather than a gift, and further, that the law imposing an inheritance tax on gifts is subsequent to the date of the transaction."

interest was liquidated the other co-owners necessarily had to adjudicate to defendant exactly one-fourth of the total area of the properties, since the important point is that the *value* of the parcel of land adjudicated to him be in a proportion of one-fourth of the remainder of the lands corresponding to the other co-owners. And in the case at bar it is obvious that this is so, since although in the arithmetical division of the property a little less than one-fourth of the total area was adjudicated to defendant, the fact is that it was compensated by the fact that defendant only received flat lands with a frontage on the highway proportionally greater than the rest of the properties (see finding of fact No. 16), José Ramón Quiñones and his brother and sisters having kept lands which hardly had any agricultural value.

"Furthermore, defendant intervened personally in the segregation of the parcel of 16.75 cuerdas adjudicated to him in settlement of his interest, and he never signified his inconformity with the adjudication. After the parcel was adjudicated to him 'in settlement and adjudication of his share in the community,' he set forth in the deed of division of community *that he relinquished in favor of the other co-owners 'each and every right, title, and interest which he had and corresponding to him as such co-owner' in the remainder of the properties* (see exhibit 1). And it must be recalled that after José Ramón Quiñones acquired these properties in 1941, defendant continued receiving one-fourth of the fruits of the property notwithstanding he was only entitled to the naked ownership of such fourth part (see findings of fact Nos. 9 and 10), and in any event that would be sufficient compensation for any piece of land which defendant failed to receive."

Appellant first argues his challenge of finding No. 3. He maintains that "the court erroneously held . . . that the conveyance made by Doña Paca Quiñones Guzmán is a contract of sale, such conveyance being an onerous gift inter vivos."

His elaborate exposition of the case law and the scientific doctrine on the concept of gift and on the multitudinous ways in which such gift may be disguised or presented in an indirect form is most interesting. However, he

has not convinced us that the contract whereby Mrs. Quiñones Guzmán transmitted to José Ramón Quiñones the properties and the rights described in the counterclaim is not a contract of sale in which the annuity represented the price, but rather one of onerous gift inter vivos, and that, assuming that this was the contract which they purported to execute, such gift is null and void and without any juridical value between the parties and their successors for the purpose of transferring their full ownership to the purchaser.

The specific contract herein involved, although doctrinal or practically having affinity with the onerous gift inter vivos, cannot be considered as a gift. There was no evidence that the parties treated it as a gift.[19]

---

[19] Omitting the description of the properties and rights object of the contract and the proof or certification of its execution issued by the Vice Consul which is attached to the document, the text of the latter is as follows:

"Number — In the City of Barcelona, Spain, on the third day of the month of September nineteen hundred and forty-one. BEFORE ME: *Licenciado*, I mean, Mr. Temple Wanamaker, Jr., Vice Consul of the United States of America in this city, THERE APPEARS: As only party, Doña María de los Dolores Quiñones Guzmán, commonly known as Francisca or Paca Quiñones, a citizen of the United States of America, of full age, single, property owner, and a resident of this city.—The appearing party is known to me, and, in my judgment, she has the legal capacity necessary for this execution, and I attest by her statements to her age, status, profession, and residence, wherefore the said appearing party states: FIRST: That Doña María de los Dolores Quiñones Guzmán, known also as Francisca or Paca Quiñones, is the owner in fee simple of the properties described below which she acquired by title of inheritance, all of which are situated in the Municipality of San Germán, Island of Puerto Rico: (description of eleven properties).—SECOND: Likewise that the said Doña María de los Dolores Quiñones Guzmán, known as Francisca or Paca Quiñones, is the owner in fee simple, by inheritance, of an undivided interest of two-fourths of the property described below and also of the usufruct from the other two-fourths belonging to the heirs of her brothers, Tomás Ramón Canturriense and Rosendo Quiñones Guzmán, which property is the following: (The three parcels object of redemption are described.)— THIRD: That she has agreed to sell, and does hereby sell, to her nephew, José Ramón Quiñones, of full age, a bachelor, Chairman of the Public Service Commission of Puerto Rico, and a resident of San Juan, Island of Puerto Rico, United States of America, each and everyone of the rights

The terms of the contract are simple and clear; there is no ambiguity in them; they do not lend themselves to possible doubts respecting the executing party's intention and the nature of the contract of sale. In such case we should follow the literal sense of its clauses. Where it says—legitimate declaration of the will of the vendor—"That she has agreed to sell, and does hereby sell, to her nephew, José Ramón Quiñones Quiñones . . .", cannot be taken to mean "That she has agreed to donate, and does hereby donate, to her nephew, José Ramón Quiñones Quiñones . . . ."

The subsequent conduct of vendor and purchaser, the latter paying and the former receiving, month after month, since September 1941 and until January 12, 1954, when she died, a monthly pension of $400, and which was calculated at "a total sum of about $60,000," dispels the idea that it is "a disguised onerous gift inter vivos," even if the pension were less than the normal rent from the properties, since the only obligation which the Civil Code—§ 1334—imposes on the purchaser is to pay for the specified thing sold "a certain price therefor in money or in something representing the same."

and actions which may correspond to her in the properties above described, conveying to him as of today any title and interest which the vendor has thereto, in consideration of a monthly pension of four hundred dollars (legal tender of the United States of America) which Mr. Quiñones binds himself to pay to the executing party for life.—FOURTH: Mr. Quiñones binds himself to accept this contract within a period of six months counted as of the day hereof, the effects of which acceptance shall be retroactive to those of the present execution. It is a condition of this contract that each and everyone of the properties described shall be subject to the pension liability during the life of Miss Quiñones. (s) María F. D. Quiñones."

By the public deed executed by José Ramón Quiñones on October 20, 1941, he accepted and ratified that contract "solemnly setting forth that he accepts in its entirety the deed copied above with all the conditions and obligations therein, binding himself to pay to the vendor, Miss Quiñones, a monthly pension of FOUR HUNDRED DOLLARS ($400) for life, counted as of the third day of September of the present year nineteen hundred and forty-one."

As stated by Manresa—vol. 10, p. 63, 5th ed.—"In order to reach a conclusion on the truth of the price, we say as does Pacifici Mazzoni (1): It is correct that the price is the economic equivalent of the thing, but let it be clearly understood that in order to consider such equivalence as constituted it is not necessary that the price represent exactly the sale value of the thing sold, but that it is sufficient if the price itself represents to the vendor some appreciable utility in substitution of that which he used to derive from the thing."

We do not believe that the challenge of the sale made by Rosendo Quiñones in his counterclaim should prosper. Since the contract is one of sale in the execution of which the essential legal requirements were substantially met and which was definitively completed when payment of the pension ceased by the death of the vendor in January 1954, Rosendo Quiñones Irizarry and other heirs of the latter were bound to respect the same whatever may be the form in which it may have been executed. Sections 1206, 1208, 1209, 1210 and 1230 of the Civil Code. The defective deed, by reason of the notary's incompetency, or by reason of any other fault in its form, shall be considered as a private instrument when signed by the parties who initiated the same, and a private instrument, legally acknowledged, shall have, with regard to those who signed it and their legal representatives, the same force as a public instrument—§§ 1177 and 1179 of the Civil Code. No one denied that Doña Francisca did not sign the instrument executed in Barcelona.

He accepted the existence, validity, and effectiveness of that contract in executing the deed of division of community on January 21, 1944. (See paragraph three thereof at p. 63.)

Assuming that the contract was void, the action of nullity had prescribed on October 20, 1945, counting the four-year term fixed by § 1253 as of October 20, 1941, when the

purchaser accepted the contract. It was up to the vendor to bring the action, since her death occurred in 1954.

■ By the physical dominion possession, with proper title—even if it was not perfect—quietly, publicly and peacefully, in good faith and uninterruptedly,[20] for more than 13 years—counted as of October 20, 1941, when he accepted the sale, and until March 21, 1955, when for the first time Rosendo alleged its nullity—José Ramón Quiñones had consolidated his full ownership right to those properties and rights by ordinary dominion prescription. Section 1857 of the Civil Code.

If the contract executed by virtue of the deeds of September 3, 1941 and October 20, 1941, was actually a contract of onerous gift inter vivos, the fact that the alleged donee, José Ramón Quiñones, entered into the immediate physical possession of the properties and rights donated and his prompt performance in the monthly payment of the life annuity until the death of the alleged donor, and his material possession by virtue of the written title of gift, publicly, peacefully, in good faith, and uninterruptedly from October 20, 1941 until March 21, 1955, was sufficient in law to acquire by ordinary prescription a perfect title of full ownership to the properties donated. What donor and donee could have failed to do respecting the execution of a perfect title of gift, assuming that they wished to do such a thing, was done for them by ordinary prescription, which cured,

---

[20] In paragraph 7 of his counterclaim, first cause of action of nullity, the counterclaimant himself alleged:

"7.—That plaintiff and counterdefendant, José Ramón Quiñones, has been in possession and enjoyment, and has operated for his sole and exclusive benefit, the properties allegedly acquired from the decedent, María de los Dolores Quiñones Guzmán, known as Doña Francisca and Doña Paca Quiñones Guzmán, receiving the fruits from such properties for his own and exclusive benefit, and that the said plaintiff and counterdefendant has failed to pay to defendant and counterplaintiff his share of the fruits and benefits from such properties in an amount of not less than TWENTY THOUSAND DOLLARS ($20,000)."

convalidated, and removed all the defects, vices, faults, flaws, imperfections, and deficiencies of such title of gift.

If we add to that period of 13 years the period during which the predecessors held the legal possession—47 years, counted as of 1894 and until 1941, of continued possession by their aunt, Doña Francisca, and uncle Don Mariano Quiñones Guzmán—pursuant to §§ 1859 and 1860 of the Code, making a total of more than 60 years of continuous physical possession, José Ramón Quiñones had already acquired by extraordinary prescription a perfect and independent dominion title. This makes it unnecessary to discuss other grounds of nullity of the alleged gift raised in appellant's brief.[21]

---

[21] By order entered on June 3, 1954, by the Superior Court, San Juan Part, the eight surviving nephews and nieces named Sara María, Antonia, José Ramón, and Segismundo Quiñones Quiñones; Norberto Alfredo and Rosendo Quiñones Irizarry; Fernando' Quiñones Rosado; and Carlos Manuel Dámaso Quiñones Lugo, were declared the sole and universal intestate heirs of the vendor, Francisca Quiñones Guzmán.

While the action of legal redemption was being prosecuted, but without the answer and the counterclaim having been yet presented, coheir Carlos Manuel Dámaso Quiñones Lugo, as only party plaintiff, brought an action on January 10, 1955 before the same Mayagüez Part of the Superior Court, against José Ramón Quiñones Quiñones, praying that "the deed of September 3, 1941, executed by María de los Dolores Quiñones Guzmán, known as Francisca or Paca, before Mr. Temple Wanamaker, Vice Consul of the United States of America in the city of Barcelona, Spain, as well as deed No. 145 of acceptance and ratification, executed on October 20, 1941 before Notary Oscar Souffront, of Mayagüez, Puerto Rico, be declared null and void." The text of the deed of acceptance and ratification executed by José Ramón Quiñones on October 20, 1941, before Notary Oscar Souffront, in which is copied the instrument of sale with price of life annuity executed by Doña Francisca on September 3, 1941, before the Vice Consul, which was subsequently challenged in the action of redemption, was fully inserted in that complaint. The grounds of nullity therein alleged were:

"(A) Because the said instrument was not executed in pursuance of the legal requirements and the laws governing the notarial profession in Puerto Rico, by failing to execute the same in one single act and to observe the other requirements by law provided.

"(B) Because the Vice Consul, Mr. Temple Wanamaker, Jr., is without legal authorization to execute a deed of that nature.

"(C) Because there was no consideration involved in that contract,

Since the contract is actually a contract of sale—not of onerous gift inter vivos—in which the annuity played the role of price, we need not consider the error attributed by plaintiff to conclusion of law No. 4, relative to the counterclaim, in which it was determined that if the conveyance had been considered as an onerous gift, all the requirements

---

since the amount of FOUR HUNDRED DOLLARS a month stipulated as a condition of the contract only represents a small fraction of the fruits from said properties which are in possession of defendant José Ramón Quiñones as administrator."

José Ramón Quiñones filed a motion to dismiss that complaint on the ground of insufficiency. The same having been argued and submitted for decision to the distinguished magistrate presiding the court at the time, Ángel Fiol Negrón, on March 31, 1955 he entered an order which in its pertinent part is as follows:

"(1) According to § 1213 of the Civil Code; 1930 ed., every contract is valid whenever there concur the three requisites of (a) the consent of the contracting parties, (b) a definite object which may be the subject of the contract, and (c) consideration for the obligation which may be established. According to § 1214, consent is shown by the concurrence of the offer and acceptance of the thing and the consideration which are to constitute the contract. The Code is silent and we find nothing in the case law to the effect that the consent of the parties, namely, the concurrence of the offer and the acceptance of the thing and the consideration, must appear in a single act or instrument. On the contrary, the said § 1214 contemplates the possibility of a subsequent acceptance, and even at a different place, in providing that the acceptance by letter does not bind the person making the offer but from the time it came to his knowledge.

"It is true, as alleged by plaintiff, that the acts and contracts the object of which is the conveyance of rights on real property must appear in a public instrument. Section 1232 of the Civil Code, 1930 ed. This does not mean, however, that the conveyance must be completed and executed in a single public instrument, and the acceptance may appear in another different and separate public instrument.

"(2) The provision contained in § 1232 of the Civil Code, 1930 ed., to the effect that the acts and contracts involving rights on real property in Puerto Rico must appear in a public deed, is applicable only to acts and contracts executed in Puerto Rico, since the Code itself provides in § 11 that 'the forms and solemnities of contracts, wills and other public instruments are governed by the laws of the country in which they are executed,' and that 'when such acts are authorized by diplomatic or consular officials of the United States abroad, the formalities established for their execution by the laws of the United States shall be observed.' Such forms and solemnities include the authority of the official before whom the act or contract is executed and the formalities and solemnities of the act or con-

and solemnities of law were also met and observed in its constitution.

The same may be said of defendant's challenge to conclusions Nos. 1 and 2 respecting the first cause of action of the counterclaim, according to which the ownership was acquired by ordinary prescription of 10 years and also by

tract itself. We find, as to the former, that the consular official of the United States in Barcelona, Spain, before whom the instrument of September 3, 1941 was executed, is an official authorized by the laws of the United States, among other things, to authorize or execute within the limits of his consulate any notarial act which any notary public is authorized by law to do within the United States. 22 U.S.C.A. § 98, p. 47. As to the latter, in the absence of allegation to the contrary in the complaint, we must assume, infer, and conclude that the consular official complied with and observed in the said act the solemnities established by the laws of the United States. Section 464(32) of the Code of Civil Procedure, 1933 ed. On the other hand, even if the instrument in question were considered a private instrument, it has the same force and effect as the public deed has with regard to the plaintiff, heir, and successor of the executing party. Section 1179 of the Civil Code, 1930 ed.

"(3) It appears from the complaint that there was sufficient cause or consideration in the contract of conveyance executed between the decedent and defendant. It is not unusual nor strange for a person to convey to another person properties which he cannot or does not wish to administer personally and thus secure for himself a fixed pension in return for the conveyance. Such is the case of the onerous gift contemplated in § 560(2) of the Civil Code, 1930 ed., and, more specifically, the contract of *censo reservativo* described in § 1499 of that Code.

"The pension of $400 a month, or $4,800 a year, is not inadequate nor derisive considering the appraised value of $56,200 of the properties conveyed by the decedent herself. We should not lose sight of the fact that the latter, who had no forced heirs, could dispose freely of her property, and nothing is alleged in the complaint to the effect that there was fraud, deceit, or undue influence in the specific conveyance made. On the other hand, it is alleged in the complaint that the decedent left other property subject to division.

"(4) From the foregoing it must be concluded that the complaint does not state sufficient facts of cause of action, and, it not being susceptible of amendment, the action brought should be dismissed.

"Judgment will be rendered and entered by the clerk subject to paragraph 4 *supra* with costs on plaintiff, and without attorney's fees."

Appeal was taken before us from the judgment, the petition having been numbered 11652 in the Office of the Secretary of this Supreme Court. On September 20, 1956, we rendered judgment, without opinion, affirming the judgment appealed from.

extraordinary prescription of 30 years. Appellant, on the false assumption that the contract was a contract of gift rather than of sale, which premise is the juridical support of the great part of his contentions on review, maintains that that gift is nonexistent because the legal requirements and solemnities proper of every gift were not met in its constitution, and, consequently, that the continuous physical possession of those properties by José Ramón Quiñones for more than 10 years was a vicarious possession, in representation of the owner, never his most personal dominion possession.

---

The action of nullity was brought by Carlos Manuel Dámaso Quiñones (son of Carlos Eladio Quiñones Guzmán, Doña Francisca's brother) as intestate heir of Francisca Quiñones Guzmán. In the first place, it alleges the fact of the death of Doña Francisca and the entry of the said order declaring her aforementioned eight nephews and nieces, among them, plaintiff therein and Rosendo Quiñones Irizarry, her sole and universal heirs, and that "in addition to the properties in process of partition, the decedent also left other properties consisting of several rural properties devoted to the cultivation of sugarcane which belong to the members of her succession and which are in possession of defendant José Ramón Quiñones Quiñones."

Rosendo filed his counterclaim in the redemption in March 1955, two months after the former complaint had been brought by his coheir, Carlos Manuel Dámaso Quiñones. The three grounds of nullity alleged by the latter are reproduced by Rosendo in the action of nullity of the same instruments (sale and acceptance of sale) exercised in the counterclaim. Ground (A) in the former's complaint is designated (a) in the latter's counterclaim; (B) is designated (b); and (E) is designated (e). Comparing carefully the three grounds of the complaint, the same were essentially incorporated into the first 10 grounds of nullity of the counterclaim. Ground (K) of nullity adduced in the counterclaim for failure to pay the inheritance tax on the estate of Mariano Quiñones Guzmán, was not set forth in the complaint by Carlos Manuel. Although Rosendo did not appear as a party in that litigation, he was related to plaintiff by ties of solidarity.

Plaintiffs-appellees offered the original record of that action during the trial before the trial court. Defendant objected because he was not a party to the action. Definitively it was neither rejected nor admitted in evidence. The trial court said: "The court shall consider it in the decision of this case, and, among the things which it will decide in this case, it shall decide whether that judgment applies in this litigation." See pp. 102–06 of the transcript, piece 1. The trial court did not decide in its judgment anything in particular on this question.

■ Lastly, appellant alleges that conclusion of law No. 5, respecting the counterclaim, in which it was determined that the contract of sale in itself was not void by reason of the failure to pay the inheritance tax which the vendor was bound to pay as sole heir of her brother, Francisco Mariano Quiñones Guzmán, was erroneous.

At the preceding pages 261 and 262 we said that a fraction of the interest which Francisca Quiñones Guzmán sold in 1951 to José Ramón Quiñones had been acquired by her by testate inheritance from her brother, Francisco Mariano, upon his death in May 1922. At the time the sale was carried out, October 20, 1941, the tax on the inheritance left by the decedent had not been paid.

Did the existence of that tax liability which devolved upon the heir-vendor, the origin of which dates back to May 1922, produce such a powerful hindering force in law as to make impossible or prohibit absolutely, and under penalty of complete nullity, the birth, perfection, existence, validity, effectiveness, compulsoriness, and performance of the contract of sale in itself (respecting the fraction of the properties, rights, and actions transmitted which she had inherited 20 years ago from her brother), between the contracting parties and their predecessors, as appellant seemingly maintains? We think not.

The provision of law applicable on the date the contract was perfected—October 20, 1941—is the following § 12 of Act No. 99 of 1925 (Sess. Laws, p. 790), as amended by Act No. 20, approved April 27, 1933 (Sess. Laws, p. 232):

"Section 12.—Except in such special cases as are determined in section 5(a) of this Act, no court shall approve the partition or distribution of the estate of any decedent or allow any final settlement of the accounts of any executor, administrator, trustee or person administering any estate, unless the special receipt or receipts as provided in section 11 of this Act, have been produced and exhibited; and no notary shall issue,

authorize or certify any instrument of award, partition, distribution, alienation or hypothecation of property unless such receipt or receipts issued by the Treasurer are presented; and no registrar shall record in any registry under his charge any instrument or judicial decision, ruling or judicial warrant, authorized, rendered, or issued in connection with the partition, distribution or delivery of such property, unless such receipt or receipts of the Treasurer are presented; and persons violating the provisions of this section shall be liable for all taxes uncollected because of such violation, with interest thereon, as provided in section 9 of this Act, and they shall be guilty of a misdemeanor punishable by a fine of not less than one hundred (100) nor more than one thousand (1,000) dollars, or by imprisonment in jail from three months to one year, or by both penalties, in the discretion of the court."

Section 9 of Act No. 99 *supra*, as also amended by Act No. 20 of 1933, provided:

"Section 9.—All taxes imposed under section 2 of this Act shall be paid into the Treasury of Puerto Rico, by the administrators, executors, trustees or other persons administering the estates charged with said taxes; and all such administrators, executors, trustees or persons shall be liable for such taxes, with interest, as hereinafter provided, until the same shall have been paid. Such taxes shall become due and payable within one hundred and eighty days after the death of the predecessor in interest and shall thereafter become a preferential lien upon all the properties of the decedent and shall remain a lien until totally paid. If said taxes are not paid within the stated term of one hundred and eighty days, interest at the rate of one (1) per cent for each month or fraction thereof shall be charged and collected thereon, and the collector or other agent duly authorized by the Treasurer shall proceed, after obtaining the written consent of the Treasurer, to collect said taxes by attaching and selling the estate of the decedent in the same manner and through the same embargo proceedings as are established by existing laws for the collection of property taxes."

In our civil law a contract exists from the moment one or more persons, with full capacity to act, consent to bind himself or themselves, with regard to another or others, to

give something or to render some service; it is valid between the parties who execute it and their heirs; in general, it is perfected by mere consent, and from that time it is binding not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law. That of sale in particular is perfected between vendor and vendee and shall be binding on both of them, if they have agreed upon the thing which is the object of the contract and upon the price, even when neither has been delivered.[22]

■ We found nothing in § 12 *supra* which at that time precluded an heir from selling or alienating the properties, rights, and actions acquired as such heir, and from the moment of his predecessor's death, by reason of nonpayment of the inheritance tax which he was bound to pay. It did not prohibit transactions or business involving hereditary property as long as they were carried out and maintained in the private ambit of the parties and their heirs. However, when those parties wished their acts or contracts to be impressed with notarial public attestation, or that they receive the necessary judicial sanction, or that they enjoy the public guarantee of the registry against third persons, then it was a necessary prerequisite for the contracting heir to have the "receipt or receipts issued by the Treasurer" to prove payment of the inheritance tax which he was bound to pay.

In order to secure the collection or payment of the tax, by § 12 the creditor State deprived the heirs of notarial, judicial, and registration services, thereby keeping the capital from disappearing in the circulatory torrent of business and in the traffic of property until the tax liability arising from the hereditary succession was paid. For the purposes

---

[22] Sections 1206, 1209, 1210, and 1339 of the Civil Code.

specified in that legal provision—to approve the partition or division of the estate of the decedent, to allow the final settlement of the accounts of the executor, administrator, trustee, or person administering any estate, respecting the courts; to issue, authorize, or certify any instrument of award, partition, distribution or alienation of property, respecting the notaries; and to record any instrument, judicial decision, or judicial warrant authorized, rendered, or issued in connection with the partition, distributon, or delivery of such property, respecting the registrars of property, "unless such receipt or receipts of the Treasurer are presented"—the jurisdiction, competence, and functions of notaries, judges, and registrars of property were absolutely prohibited and barred for all such time as such receipt or receipts were not issued. The notary, judge, or registrar acting in violation of those provisions would be liable "for all taxes uncollected because of such violation, with interest thereon," and was guilty "of misdemeanor punishable by a fine of not less than one hundred (100) nor more than one thousand (1,000) dollars, or by imprisonment in jail from three months to one year, or by both penalties, in the discretion of the court."

On the other hand, § 9 already copied provided that (1) "all such administrators, executors, trustees or other persons administering the estates charged with said taxes . . . shall be liable for such taxes, with interest . . . until the same shall have been paid"; (2) it provided that those taxes "shall thereafter become a preferential lien upon all the properties of the decedent and shall remain a lien until totally paid"; and (3) it authorized their collection, under certain conditions, "by attaching and selling the estate of the decedent . . . through the same embargo proceedings as are established . . . for the collection of property taxes."

However, none of those sections prohibited private business between the parties with respect to those properties.

The public deed of alienation or disposition of inherited property made in violation of that provision could lose its character of authenticity and its probative force as such, but if it is signed by the executing parties it shall be valid between them as a private document, without affecting the existence and validity of the juridical act itself therein set forth. The only thing that was affected was the solemn manner sought to be impressed.

As long as neither notarial services nor judicial intervention, or the public protection of the registry were necessary for the birth, validity, and effectiveness of the obligations and private contracts between the parties obligated or contracting parties, the prohibitions of § 12 *supra* did not come into play.[22a]

This was our holding in *Álvarez* v. *Manzano*, 66 P.R.R. 344, 352 (1946). That was an action for performance of a private contract of compromise involving hereditary property and rights made on June 30, 1944 between Emilio Álvarez and the heirs of his deceased wife. By the private contract the latter bound themselves to sell to Álvarez, and the latter to buy, their shares "in the estate left by the deceased Doña Aurelia Manzano." The respective prices of the properties were fixed. It was agreed that the formal deed would be executed at some future date, since it was first necessary to determine the amount of certain debts. Later there arose certain disagreements between the contracting parties on the interpretation of the contract and the compromise was not voluntarily executed, wherefore Álvarez brought action for its specific performance. The trial court rendered judgment which gave rise to the complaint. It ordered that upon the plaintiff depositing with the clerk of the court the sum of $9,532.70, the defendants shall execute in favor of plaintiff "the corresponding deed of conveyance

---

[22a] See *Ruiz* v. *Ruiz*, 74 P.R.R. 321 (1953).

of the property . . . described in the complaint, and in case defendants fail to do so the marshal is hereby ordered to execute the proper deed of conveyance."

On appeal, the defendants alleged that "the lower court acted without jurisdiction in this case in approving the partition of the estate of Aurelia Manzano without requiring the inheritance tax receipt." We decided that contention as follows:

"The contract was perfected in Arecibo on June 30, 1944, when both parties, vendors and purchaser, reached an agreement as to the price and the thing to be sold. What the parties postponed to be executed in Ciales was the consummation of the contract, and since the consummation was not carried out then, plaintiff has now demanded it by way of this action for performance of contract.

"[4] Defendants argued that the lower court erred in granting the complaint because the aforesaid document had not been approved by the court. They maintain that this approval was necessary because the property was subject to judicial administration.

"Approval was not necessary, for all the persons interested in the inheritance, that is, plaintiff and defendants, are of age. See by analogy § 604 of the Code of Civil Procedure. Once the parties have come to an agreement, or the judgment decreeing the performance of the contract becomes unappealable and the corresponding deed is executed, it will be sufficient to pray the court to terminate the judicial administration and to order the administrator to deliver the property to the purchaser.

"[5] The defendants contended that the lower court acted without jurisdiction in this case in approving the partition of the estate of Aurelia Manzano without requiring the inheritance tax receipt.

"Defendant's contention is predicated upon the provisions of § 12 of Act No. 99 of August 29, 1925, (Laws of 1925, p. 790), as amended by Act No. 20, approved April 27, 1933 (Laws of 1932–33, 232).

"Undoubtedly it was through this contract, the performance of which was decreed by the court, that the partition of the

estate was carried out by Aurelia Manzano. But since all the heirs are of age the partition of the estate does not require the approval of the court, pursuant to § 604 of the Code of Civil Procedure. Therefore, § 12 did not deprive the court of jurisdiction to render the judgment in the present case. We do not mean that the parties herein may circumvent the provisions of the above-mentioned § 12, for upon executing the deed, which was ordered by the judgment, the notary, in compliance with said § 12, would not authorize the deed unless the receipt evidencing the payment of the inheritance tax were presented. The registrar in turn, pursuant to that same § 12, would not record the deeds unless the inheritance-tax receipts were produced."

We affirmed the judgment appealed from which recognized the validity and effectiveness, between the parties, of the contract of compromise signed by them and which bound the heirs to perform the same notwithstanding the inheritance tax had not been paid.[23]

At the end of his brief (pp. 112 and 113) appellant alleges as a final challenge that the trial court erred in refusing to admit documentary and expert evidence for the purpose of establishing the actual value of the properties object of the "gift," and erroneously admitted oral and

---

[23] In *Caballero* v. *Kogan*, 73 P.R.R. 617, 627 (1952), we reiterated the holding in *Álvarez* v. *Manzano* on the consummation, validity, and effectiveness of the private contract subscribed between the parties. Actually the defect is a serious one in the solemn form of the contract which prevents it from having legal effects as an authentic instrument as long as the inheritance tax is not paid. As soon as the tax is fully paid, the instrument becomes authentic. The notary should in no way authorize instruments of that nature for he is subject to the penal consequences of his unlawful act. However, since it is one of the measures for the protection of the collection of tax credit, the nonpayment should not have juridical consequences which are so disastrous for the free contraction such as to bar recovery of the instrument, or acquire for the first time the authenticity lost or that which it had not acquired as a result of the violation of the statute, and much less that of producing the absolute nonexistence of the act or contract itself object of the instrument. We could say that as long as the tax remains unpaid, the authenticity of the instrument is subject to a suspensive condition. See *Mercedes Bus Line* v. *Rojas*, 70 P.R.R. 513, 516 (1949).

documentary evidence which was immaterial, irrelevant, and inadmissible on other grounds. He did not argue this assignment. Only at the end he says:

"We do not deem it necessary to add assignment No. 9 to the grounds of error which have been discussed at length in this brief."

After what we have stated in the body of this opinion, and in view of the provisions of Rule 50 of the Rules of Civil Procedure, we need not consider further the grounds on which that assignment may rest.

Therefore, none of the errors assigned by appellant were committed, wherefore the judgment will be affirmed subject to the following modifications:

A. The acquisition by subrogation of the redeemed interests to be made, in accordance with the second paragraph of § 1412 of the Civil Code shall be made pro rata with regard to the share which each redeeming plaintiff, respectively, may have in the thing owned in common, since such shares are not alike.

B. The property having the greater area, which is described in the complaint of redemption under letter "A," from which the parcel of 16.75 cuerdas was segregated, must be described in the same manner as in paragraph SIX of deed No. 6 of division of community executed on January 21, 1944 before Notary Oscar Souffront, that is, with its new boundaries and the present area of 49.75 cuerdas.

C. Plaintiffs bind themselves not to sell the interests, rights, and actions redeemed during a period of four years counted as of the date of execution of the public deed of transfer of such interests, rights, and actions, and it shall be so set forth at the proper time in the Registry of Property.